ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY
*v.* BROGAN.

Opinion delivered October 28, 1912.

1.  TRIAL—OBJECTION TO EVIDENCE.—An objection, in an action for personal injuries, to testimony and conclusions arrived at "from an examination made by the witness of X-ray pictures, when the wit-ness testified that he was no X-ray expert," was insufficient to assign error in the admission of testimony showing a controversy mong the physicians as to the nature of plaintiff's injuries and his present and future condition as a result therefrom.   (Page 540.)

2.  DAMAGES—PERSONAL INJURIES—EXCESSIVENESS.—Where a locomotive fireman, twenty-seven years of age, in good health, earning from $125 to $150, with prospect of earning from $175 to $250, was perma-

nently injured and by loss of a limb incapacitated to perform the duties of his vocation, endured intense suffering for three years, and incurred a surgical bill of $500, a verdict of $25,000 was not excessive. (Page 540.)

3. DAMAGES—EVIDENCE OF LIFE EXPECTANCY.—Where there was evidence of plaintiff's age at the time of his injury, and that he was then in good health, the jury may determine the probable duration of his life, though mortuary tables were not in evidence. (Page 542.)

4. INSTRUCTION—ERROR CURED BY OTHER INSTRUCTIONS.—An instruction, in an action by a fireman for injuries received from his engine colliding with a car on a side track, that the jury find for plaintiff if he was injured, in the performance of his duties, from his engine colliding with a car which defendant, in its failure to exercise reasonable care, had negligently placed and left standing, and which caused the collision, was not objectionable as assuming that defendant was negligent, when followed by other instructions submitting to the jury the question whether defendant was negligent in placing the car on the side switch. (Page 543.)

5. MASTER AND SERVANT—ASSUMED RISK.—Where a locomotive fireman is injured in a collision between his engine and a car on a side switch, resulting from the railroad company's failure to exercise due care to permit safe passage for the engine, the fireman is not chargeable with having assumed, as an incident of his employment, the risk of being hurt unless he realized the danger and then voluntarily exposed himself to it. (Page 544.)

6. SAME—INSTRUCTIONS AS TO ASSUMED RISK.—Instructions correctly announcing the doctrine of assumed risk are not open to objection that they ignore the defense of contributory negligence; the latter defense being presented in other instructions. (Page 545.)

7. SAME—DEFENSES.—The defenses of "assumed risk" and "contributory negligence" are separate and independent; the former arising out of contract, while the latter does not. (Page 545.)

8. APPEAL AND ERROR—HARMLESS ERROR.—An instruction which submitted the issue of contributory negligence, if erroneous, was harmless as to the defendant where there was no evidence tending to prove that plaintiff was negligent. (Page 546.)

9. TRIAL—ARGUMENT OF COUNSEL—ACTION OF COURT.—Statements of plaintiff's counsel in argument that defendant had time before suit was filed to offer settlement, and that none was offered, were not prejudicial where they were immediately withdrawn, and the court admonished the jury not to consider them. (Page 547.)

10. DAMAGES—PERSONAL INJURIES—INSTRUCTION.—Where, in an action for personal injuries, there was evidence limiting plaintiff's expenses to a certain sum, an instruction that, in arriving at the amount of plaintiff's damages, the jury should consider "the ex-

pense to which he is subjected as a result of his injured condition" was not erroneous, as permitting the jury to speculate. (Page 548.)

Appeal from Hot Spring Circuit Court; *W. H. Evans,* Judge; affirmed.

### STATEMENT BY THE COURT.

Appellee was in the employ of the appellant as a locomotive fireman. On October 17, 1911, he was engaged in firing on a locomotive engine in the Argenta yards while switching freight cars. He had never before worked in that yard as a switch engine fireman, nor had he ever worked as a switch engine fireman on any other road. He was not familiar with the tracks in the Argenta yards. He had been firing on the main line of the Iron Mountain until he was called on the night of October 17 to fire on the switch engine in the Argenta yards. He went on duty that night about 9 o'clock. Had to keep firing right along all the time to keep steam and water in the engine. He had no time to look out. Had put a fire in the engine and got up in the seat, and his eyes were blinded from the fire and heat. Five cars were attached to the head of the engine. They were moving towards the north. He didn't know what kind of cars were coupled in front of the engine, other than that there was a box car next to the engine. That car was as high as the top of the headlight on the engine. The distance between the end of the box car and the headlight on the engine was about two feet. The box car, appellee says, caused the headlight to reflect back in his eyes. He could not have seen the car standing out at the side and ahead of the engine because of the light reflecting in his eyes. The signals for working purposes were given on the engineer's side. As his engine was propelling, at a slow speed, the cars ahead of it along the lead track, the cab of the engine collided with a car standing on the side track leading out from the lead track on appellee's side of the engine. The cars ahead of the engine on the lead track had passed the car standing on the side track, but the cab of the engine cornered it. When appellee heard the crash he endeavored to get out through the front window, but his leg was caught, and he sustained serious injuries, which will be hereinafter described.

Appellee did not know that the box car with which the engine collided was so close to the lead track on which the engine was moving. This car had been dropped into the side track from the lead track and left there by the engine on which the appellee was at work. After the box car had been dropped in on the side track from the lead track, the engine had pulled back onto the lead track with the remaining five cars of the string, and as these cars were pushed forward by the end of the side track the collision occurred by which the appellee was injured.

The foreman of the switch crew directed the movement of the switch engine and the location of the cars. He had placed the car in the position where it was at the time it struck the engine. He states that the appellant company had rules covering the placing of cars in the clear on side tracks. The rule required that "conductors must see that brakes are set on cars they leave on sidings, and when the siding is on a grade they must, when practicable, couple all the cars together; and, in addition to setting the brakes, the wheels must be blocked and safety switches properly adjusted. When not in use safety switches must be left open. In switching, trainmen must know that brakes are in good order before cutting off cars."

The rule refers to conductors, and in switch yards the yard foreman is the same as the conductor. There was a down grade there to the east from the south end. The grade was such as to cause the cars to go away from the lead, and the engine was headed east when they kicked the car in on the track where it stood when the collision occurred. The foreman stated that, according to his judgment, the rules of the company were complied with in placing the cars there that night. The down grade would be to prevent the car coming out if moving. The brake would not have to be set on that car. If the brakes were set on the cars below, they would hold that car. He went down and got on top of the rail, which was the custom and the rule, and stood on top of the rail and held his hand out, and ordinarily if it cleared his fingers, holding his arm out straight as he did that night, it would clear a car or an engine. He adopted the usual method that they had adopted and been using for twenty-seven years

to see if it would pass, and in his judgment he thought it would. The brakes were not set on the box car that collided with the engine, nor was any block placed under the wheel on the end of the car towards the lead on which the engine was moving. He stated that it was not necessary. He kicked the car in on the track, which consisted in giving a cut of cars a start and then cutting the car loose from the rest and it rolls into the track. On that occasion he kicked the car in and walked up the lead and stood on·the rail and held his hand out, taking the precaution above mentioned. The witness testified that the box car would "have no reflection on a person's eyes looking ahead. If you were looking directly at the light alone, it would; but where you are looking at the reflection, it does not."

Appellee brought this suit on November 6, 1911, and in his complaint he alleged that "the cab in which he was working was struck by a car that had been negligently left standing on the side switch north of the one in which plaintiff's engine was running, and the left side of the cab was crushed in upon the plaintiff and seriously injured him;" that "said accident and injury was caused by the negligence of the defendant and its servants in placing and leaving on the side track, so near the lead switch, the car which struck the locomotive on which plaintiff was at work, and in negligently directing the train on which plaintiff was working to move into the side switch."

The defendant answered, denying the material allegations of the complaint, and setting up that the plaintiff was injured by his own negligence in failing to keep a lookout, which it was his duty to do; and also setting up that plaintiff "was as well informed of the dangers from cars being left too close as any of defendant's other servants, and assumed the risk of such injury as might occur thereby."

The above are substantially the facts on the issues of negligence, contributory negligence and assumed risk. The court granted and refused requests for instructions to which appellant duly excepted, and which we will comment upon in the opinion. The jury returned a verdict for $25,000, judgment was entered for that sum in favor of the appellee, and this appeal has been duly prosecuted. Other facts stated in opinion.

*E. B. Kinsworthy, W. V. Tompkins* and *R. E. Wiley,* for appellant.

1.   Where the complaint alleges negligence on the part of the defendant in a certain particular which must be sustained by evidence, it is a question for the jury to determine whether there was negligence as alleged, and an instruction which assumes that the defendant was negligent in the particular alleged is erroneous. A later instruction submitting that question would not cure the error first committed, because it could not be known which instruction the jury followed. 96 Ark. 311, 314; 93 Ark. 564, 573.

Appellee's instructions given are further erroneous in that they submit the case on the theory that appellant had the absolute right to presume that his fellow-servants would do their duty. 89 Ark. 522, 536, 537; Elliott on Railroads, 768; 93 Ark. 564, 573; 95 Ark. 506.

Section 3 of the Act of 1911, Acts, p. 55, is not meant to absolve a plaintiff from the exercise of ordinary care for his own safety  The rule of "comparative negligence" does not abrogate this duty.  1 Thompson on Neg., 255, § 269; *Id.* 258, § 272; 126 Ill. 381; 13 Ill. App. 148; 12 Ill. App. 400.

Instruction No. 1 does not correctly submit the question of comparative negligence under our statute.  1 Thompson on Neg., § 18; *Id.* § 282; 16 How. 469; White on Personal Injuries on Railroads, 622; *Id.* 643, § 459; 90 Ill. 425; 27 Ill. App. 450; 13 Ill. App. 148, 153; 92 Ill. 139; 105 Ill. 554.

2.   The appellee's instruction given by the court on the measure of damages is erroneous, and the verdict is excessive. 1 White on Personal Injuries on Railroads, § 182; *Id.* § 184; 77 Ark. 405, 412; 58 Ark. 205; 20 S. W. 766; 88 Ark. 229; 68 Ark. 6; 76 Ark. 184; 89 Ark. 541; 94 Ark. 270.

*Robertson & DeMers,* for appellee.

1.   There was no error in the instructions given on the part of appellee.  The first instruction does not assume negligence on the part of appellant in the placing of the car on the sidetrack.  Moreover, other instructions given specifically charge the jury that they must find from the evidence that defendant was negligent in placing the car, and that such negligence caused the collision and injury to plaintiff, before

there would be any liability on the part of defendant. This first instruction was in accordance with the provision of the statute, Acts 1911, p. 55, and under it plaintiff's right of recovery was made to depend entirely upon such negligence of the defendant and the absence of contributory negligence on his own part equal to or greater than that of the defendant causing his injury.   89 Ark. 424.

There was no evidence upon which to submit the question of plaintiff's having assumed the risk of the danger of being hurt by a collision between the cab of his engine and the car on the ground of his having knowledge and appreciation of the danger.  89 Ark. 424; 77 Ark. 367; 98 Ark. 227; 93 Ark. 564, 570; 90 Ark. 223.

Instructions 2 and 3 could not have led the jury to believe that appellee was absolved from the duty to exercise ordinary care for his own safety.  Appellant's contention is the result of confusing the questions of assumed risk and contributory negligence.   87 Ark. 396; 88 Ark. 243; 92 Ark. 102; 77 Ark. 458; Id. 367; 98 Ark. 227.

2.  The verdict is not excessive, and the instruction on the measure of damages is correct.  88 Ark. 225; 93 Ark. 564; 87 Ark. 443.

Wood, J., (after stating the facts).   The appellant contends that the verdict was excessive, caused "partially at least by the exploitation" in the testimony of a "disagreement amongst the doctors who treated appellee at the hospital and those treating him after he left the hospital as to whether his injuries were properly treated at the hospital, and as to the present and future results of his injuries as affected by that treatment."

The testimony of physicians on behalf of appellee, one of whom had treated him for twelve days preceding the trial, tended to show that when they examined appellee his broken leg was unhealed; that, notwithstanding the efforts of the physicians at the hospital to save appellee's foot from amputation, same was now necessary, in order to save appellee's life, and that by reason of a failure to operate at first and on account of the prolonged treatment in trying to save the limb, the bone had decayed and the limb had become so infected that it would have to be amputated above the knee, whereas, in their

opinion, if the limb had been amputated soon after the injury occurred it would have been only necessary to amputate between the ankle and the knee. In describing appellee's injuries, the testimony of physicians in his behalf tended to show that he had a broken shoulder, the bones of which, on account of the long lapse of time since the injury, could not be knit together because of the decayed bone at the fractured ends.

The testimony of the physicians and surgeons on behalf of the appellant, who treated appellee at the hospital where he was taken immediately after his injury occurred, tended to show that the methods adopted by them were the latest and most improved methods for the treatment of injuries such as appellee had received, and were adopted because of the hope they entertained of saving the appellee's limb. They gave appellee the same treatment that they gave other patients, under similar conditions, in order to save his leg; that the progress towards ultimate recovery had been satisfactory up to the time the patient was taken out of their charge, and that there had been no indication of death of the bone and no infection, and they still believed the bone could be saved.

Appellant contends here that this disputation among the doctors, as shown by the testimony, prejudiced the minds of the jury, resulting in an excessive verdict. It is sufficient to say of this contention that appellant did not make any objection at the trial to the testimony of the physicians on behalf of appellee describing the nature of appellee's injuries. Appellant only objected to one of the physicians testifying as to the nature of these injuries and giving the conclusions he arrived at as to the condition of the injury *from an examination made by the witness of X-ray pictures, when the witness testified that he was no X-ray expert.* This objection, reserved in the motion for a new trial, does not assign any error growing out of the ruling of the court in permitting testimony showing a controversy among the physicians as to the nature of appellee's injuries and his present and future mental and physical condition as a result thereof.

Moreover, the verdict was not excessive. Appellee, at the time of his injury, was twenty-seven years of age and in good health. His wages were from $125 to $150 per month, and he was in line of promotion, after three years service, to

the position of engineer, whose average monthly wage was $175 to $250. The jury were warranted in the conclusion that appellee would be permanently incapacitated for performing the duties of the vocation that he had selected and for which he was qualified. In fact, it was practically certain from the testimony that appellee, by reason of his injuries, had lost his earning power. His left leg was so badly crushed as to necessitate amputation of same above the knee, and the bone of the left shoulder, that helps to support and gives motion to the arm, was broken; and one of the physicians testified that it had been broken so long that "it would be very difficult to get down in there and wire it together." It was a question, says he, "whether the bone could ever be brought up together and kept in place." "The effect of the failure of the broken bone to reunite would cause the shoulder to drop down and the bone to come up. As a consequence he could not use the left arm without a good deal of pain as the fragments would be rubbing together all the time, and it would be impossible for him to get around on a crutch at all." There was a severe injury to the back that would give appellee "trouble with his spinal column and spinal cord for a good many years, and cause him to suffer with a nervous condition."

Appellee at the time of the trial had endured intense suffering for a little over three months. He described his suffering as follows: "I suffered pain and didn't sleep much of the time. I was awake most of the time at night. I couldn't sleep. My back hurt me. My leg and my heel hurt me so bad that they had to take the wrapping off of the bottom part of my foot, and my heel hurt so bad I couldn't stand it, and it worked independent of the front part. Every time I would move, I could feel the bone. It hurt me every time I moved, and every time I moved my back hurt. My shoulder hurt all the way up in the back of my neck. I suffered all kinds of pain and everything."

The testimony showed that for surgical treatment appellee would be at an expense of $500. Appellee at the time of his injury was receiving an average of $1,650 per annum for his work. It would require nearly $22,000 to purchase an annuity amounting to $1,650 for one during appellee's expectancy of life. If at the end of three years he had been promoted

to the position of engineer, then his yearly income for his work would have been $2,550, and it would have required over $30,000 to have purchased an annuity for appellee with his expectancy of life at the age of thirty years.

In *Railway Company* v. *Sweet*, 60 Ark. 550, this court, having under consideration the damages resulting to the family of Sweet from his death, said: "He was thirty-four years of age, in good health, a robust man. He had an expectancy, as shown by the Carlisle life tables, of twenty-five years. The jury doubtless weighed all the probabilities of loss from sickness and other various contingencies, likely to arise in the course of a man's life, and balanced these against the probabilities also of an increase of efficiency in money-making power. They might have found from the evidence that Sweet's life was worth at least eight hundred dollars per annum to his wife and children; * * * and, according to the Carlisle tables (which were in evidence), estimating money at the legal rate, it would require over ten thousand dollars to purchase an annuity of eight hundred dollars for one of Sweet's age."

So we say here, that the jury, weighing all the probabilities of loss from various contingencies, and also the probabilities of an increase in money-making power, might have well reached the conclusion that appellee would have earned for the term of his expectancy in life at least the sum of $1,650 per annum, and that he lost the power to produce this by reason of the injury, and that it was a total loss to him. It would have taken about $22,000 to have compensated him for this loss alone. When to this is added the expense of his surgical and medical treatment and damages for the mental anguish which he has endured on account of his personal disfigurement and the pain and suffering which he has undergone and must continue to undergo by reason of his bodily injuries and infirmities, we can not say that the verdict is excessive.

While mortuary tables were not in evidence, it was shown that appellee at the time of his injury was in good health, and the jury could judge from the character of the work in which he was engaged as to his power of physical endurance. In *St. Louis, I. M. & S. Ry. Co.* v. *Glossup*, 88 Ark. 225, we said: "Introduction of mortuary tables is not the only method of proving life expectancy. The question may be submitted to

the jury upon testimony showing the age, health, habits, physical condition, etc., of the individual, so that the jury may estimate the probable duration of life."

2. Appellant objected to an instruction given at the instance of appellee wherein the court told the jury, "If you find that while he was engaged in the performance of his duties as fireman, the cab of the engine on which he was working collided with a car which defendant in its failure to exercise reasonable care and precaution for the safe passage of plaintiff's engine over its tracks had negligently placed and left standing on a side switch so close to the lead switch on which plaintiff's engine was running at the time of the accident as to obstruct its free passage, and caused the collision, and as a result thereof plaintiff was injured, then the defendant is liable, etc."

Appellant contends that the above instruction assumed that there was negligence on the part of the appellant. In *Brinkley Car Works & Mfg. Co.* v. *Cooper,* 75 Ark. 325, the court had under consideration an instruction reading as follows: "If the jury find from the evidence that the Brinkley Car Works had notice that children did frequent the place of this pool, or were from the nature of the surroundings likely to do so, and that it carelessly left a pool of hot water there concealed in such a way that one would reasonably expect it to occasion injury to such children, the company would be liable for damages to the plaintiff, who, by reason of its concealed nature, walked into the pool of hot water, and was burned."

The court said: "Counsel for appellant insist that the instruction is erroneous in that it assumes the existence of facts which were disputed, viz., that the plaintiff walked into the pool of hot water on account of its being concealed, and that he was not aware of the presence of the water, or that it was hot. The instruction, standing alone, might be open to that construction, and would be objectionable; but not so when read with the other instructions given at appellant's request submitting to the jury the question as to whether the plaintiff knew at the time that the water was hot, and that it was concealed."

In other instructions following the one under consideration here, the court made it clear that it did not intend to assume as an established fact that appellant was negligent in placing

the box car on the switch track, but submitted that question to the jury. For instance, in an instruction given at the request of the appellant the court told the jury as follows: "It devolves upon the plaintiff to show, by the greater weight of the evidence, that the defendant was negligent in the manner alleged. If the proof shows that the defendant's servants exercised ordinary care in the use of the precautions taken to prevent the cab and cars coming in contact," etc. And in an instruction on behalf of the appellee the court told the jury: "If you find that the alleged collision between plaintiff's engine and the car on the side switch was the result of the failure of the defendant railway company to exercise reasonable care and precaution to place said car on said side switch," etc.

If the instruction, standing alone, is susceptible of the construction for which appellant contends, it could not be so construed when taken in connection with the instructions following it under the doctrine of the above case, and, when all are considered together, it is manifest that the court did not assume negligence on the part of appellant, but submitted that issue to be determined by the jury. There is no conflict in the instructions.

The appellant objects to the following instructions:

"2. You are instructed that if you find that the alleged collision between plaintiff's engine and the car on the side switch was the result of the failure of the defendant railway company to exercise reasonable care and precaution to place said car on said side switch and to maintain it in such position as to provide a safe passageway for plaintiff's engine, then plaintiff can not be charged with having assumed the risk of being hurt by said collision as one of the ordinary risks incident to his employment.

"3. You are instructed that plaintiff had the right to presume that the defendant railway company had discharged its duty towards him by the exercise of reasonable care and precaution for his safety by so placing the car upon the side switch and so maintaining it in a position that would provide a safe passageway for his engine, and that he can not be charged with having assumed the risk of being hurt by the collision with said car unless you find that prior to the time of the alleged collision he actually knew of the dangerous position of the car

on the side track and realized the danger of being hurt by a collision between said car and his engine, and that with such knowledge and appreciation of danger he voluntarily exposed himself to it."

The appellant contends that these instructions, as well as that part of instruction No. 1 already quoted, absolved the appellee from any duty to exercise ordinary care 'for his own protection. In instructions Nos. 2 and 3 and that part of instruction No. 1 set out above the court was declaring the rule, under the statute, in regard to the assumption of risk. The court announced that doctrine correctly according to many decisions of this court since the passage of the act of March 8, 1907, making railway companies and other companies and corporations liable in damage caused by the negligence of a fellow-servant. *St. Louis S. W. Ry. Co.* v. *Burdg,* 93 Ark. 88; *St. Louis, I. M. & S. Ry. Co.* v. *Ledford,* 90 Ark. 543; *Aluminum Company of North America* v. *Ramsey,* 89 Ark. 522; *Ozan Lumber Co.* v. *Biddie,* 87 Ark. 587.

The doctrine of the above cases is that a servant has the right to assume that a fellow servant will exercise due care in the performance of the duties imposed upon him; and if a servant is injured, while exercising ordinary care for his own safety, through the negligence of a fellow-servant, the master will be liable for the damages resulting from such negligence. While the servant does not assume any risk or danger arising from the negligence of the master or of a fellow-servant of which he has no knowledge and does not appreciate, he is not, under the act of March 8, 1907, *supra,* relieved of the duty of exercising ordinary care for his own protection. See cases *supra.*

The instructions criticised correctly declared the law under the statute on the issue of assumed risk, and they were directed solely to that issue. The court, in other instructions given at the instance both of the appellant and the appellee, presented the issue of contributory negligence. The instructions set out above are not obnoxious to criticism because they do not embrace the defense of contributory negligence. The defenses of assumed risk and contributory negligence are separate and independent. The former arises out of contract relations, while the latter does not. *St. Louis, I. M. & S. Ry. Co.* v. *Corman,* 92 Ark. 102; *St. Louis, I. M. & S Ry. Co.* v. *Holman,* 90 Ark. 555; *Johnson* v. *Mammoth Cotton Oil Co.,*

88 Ark. 243; *Southern Cotton Oil Co.* v. *Spotts,* 77 Ark. 458; *Chicago, R. I. & P. Ry. Co.* v. *Jones,* 77 Ark. 367.

The court did not err, on the specific objection of appellant, in refusing to modify these instructions so as to embody therein the issue of contributory negligence.

3.   The appellant contends that the court erred in the latter part of the first instruction, in which it undertook to present the doctrine of comparative negligence under the act of 1911, which modifies the doctrine of contributory negligence theretofore existing in this State.   We will not pass upon that statute and the court's instruction under it, for the reason that the undisputed evidence in this record shows that there was no negligence on the part of the appellee causing or contributing to his injury, and therefore the instruction of the court, even if erroneous, could not have prejudiced the rights of appellant.   The court, in our opinion, might have very well declared as a matter of law that the appellee, under the uncontroverted evidence, was free from negligence.   Therefore, the instructions submitting that issue to the jury, even if erroneous, were favorable to appellant, and it could not complain.

The appellee testified that he was not familiar with the switch tracks of the yard where he was injured; that he was called to the service about 9 o'clock that night, and was injured the next morning about 1:50 o'clock; that he did not know the position of the car on the switch track with which the engine collided; that, while it might have been his duty to look for cars on the switch track, he could not have seen the car, had he looked, for his eyes were at the time so blinded by the heat and bright glare of the fire that he had just replenished that he could not have seen had he looked; that he had no time to look out; that he was very busy firing the engine; had just got up on the seat box and was putting on the injector when the crash came.   If appellee, while discharging his duties as fireman, had no time to look out, as this testimony shows, then it was wholly immaterial whether the reflection from the car would have blinded his eyes or not.   Appellee's testimony shows he was so busy he could not look for the car when the collision took place.   The appellant offered no testimony to the contrary, and the burden was on it to do so.   His testimony is reasonable and consistent.   Therefore, it was the duty of the

jury to consider it, and reasonable minds could have reached no other conclusion than that the appellee himself was diligent in discharging his duties.

The issue of appellant's negligence was correctly submitted to the jury, and there was evidence to support the verdict. There was testimony tending to show that the foreman, who acted as conductor of the switch engine, ignored the rule introduced in evidence adopted by the company for the protection of the employees while switching. No brakes were set on this car; it was not coupled to the other cars; the wheels were not blocked. The foreman having the placing of the cars in charge only endeavored to see that the lead track was clear by placing his hand out to ascertain if there was space sufficient for cars on the lead track to pass the car on the side track. He said if it cleared his fingers, holding his hand out straight, it would clear a car or engine, and he had adopted that method and used it for twenty-seven years; that it was the usual method. But the jury would have been warranted in finding that this method itself was negligent, or the jury might not have accepted his testimony. For the fact remained that the box car was too near the lead track. Either the foreman did not take the precaution he says he did, or else the car ran down too close to the lead track after he had held out his hand, showing that it had no breaks or blocks to check it. The rule required these. Had the foreman but observed the requirements of the rule to keep the lead track free and safe from collisions, the unfortunate accident would not have happened. The slightest diligence on his part would have prevented the occurrence of the accident.

4. The record shows that in the argument to the jury Mr. A. N. DeMers, of counsel for appellee, stated: "Now, gentleman, I want to be fair about this matter; I will ask you to place yourselves in the place of the Iron Mountain railroad, and see what you would do under the circumstances in this case, then put yourselves in the place of Mr. Brogan, and see what is fair and just to both of these parties."

Mr. W. V. Tompkins, counsel for appellant, in his argument, said to the jury:

"Gentleman, as counsel ask you to put yourselves in the place of the parties, if you are going to do this, then I will

ask you to consider how it would appear to you if you had accidentally injured a man on the 17th of October, and had sent him to a hospital and was caring for him as best you could, and he should sue you on the 6th of November, as Mr. Brogan has done in this case?"

Mr. T. N. Robertson, counsel for appellee, in his closing argument, said: "Mr. Tompkins has said to you to put yourselves in the place of the railroad company, and seems to criticise plaintiff for suing on the 6th of November, when the injury occurred on the 17th of October. They had all that time to offer a settlement, and none had been offered."

Appellant objected to the argument that appellant should have offered a settlement; counsel for appellee thereupon said: "Well, I withdraw the argument since he objects to it."

Appellant's counsel then said: "I object to these wrongful statements, and then, when an objection is made, letting counsel say he withdraws them. They have already had their ill effect."

The court said to the jury: "Well, gentlemen, it is withdrawn; do not consider that statement."

Appellant saved its exception to the action of the court in permitting counsel for appellee to make such argument, and in refusing to rebuke him for making such argument.

There was no prejudicial error in the ruling of the court. The improper argument of counsel for appellee was not so flagrant in character as to create a prejudice in the minds of the jury against appellant, especially after counsel had withdrawn the remarks and the court had admonished the jury not to consider them. This action of the court and counsel was sufficient, in our opinion, to remove any possible prejudice that the objectionable argument was calculated to produce.

5.   Appellant complains of the ruling of the court in giving the instructions on the measure of damages.*   There is

---

* The instruction on the measure of damages was as follows:

Instruction No. 5: "You are instructed that if you find for the plaintiff you will assess his damages at such a sum of money as will be a fair and reasonable compensation to him for the injuries he has received as a result of the alleged accident; and in arriving at the amount of said sum of money you will take into consideration, as you find from the evidence, the nature and extent of his injuries, whether temporary or permanent in character, results reasonably certain to follow, any disfigurement of his person as a result of his injuries, the bodily pain and mental suffering he has endured, and that he is

HARE *v.* SISTERS OF MERCY.

no error in the instruction. It is not open to the criticism which appellant's counsel makes. The instruction is not argumentative, but only mentioned elements of damage proper for the jury to consider in the event that they find, from the evidence, such elements to exist. There was evidence in the record limiting definitely the expense to which appellee had been and would be subjected by reason of his injured condition, to the sum of $500. The jury therefore were not allowed to speculate as to the amount of such expense.

There is no error in the record, and the judgment is therefore affirmed.

reasonably certain from the evidence to hereafter endure, as a result of his physical injuries, the loss of earnings from his labor since he received his injuries, and the loss of earnings in the future of his life by virtue of his decreased capacity to earn money because of his injured condition, his age and reasonable expectancy of years of life, his vocation and earning capacity prior to his injury, with his probable chance of being promoted to a position of increased remuneration of his services had he not been injured, his condition of physical strength and health prior to his injuries, and the expenses to which he is subjected as a result of his injured condition."