**FORT WORTH & D. C. RY. CO. v. WILLIAMS. (No. 11138.)**[*]

(Court of Civil Appeals of Texas. Fort Worth. April 18, 1925. Rehearing Denied May 23, 1925.)

1. **Master and servant ⟨⟩129(6)—Switch foreman held not negligent in not choosing best method in releasing injured switchman.**

Switch foreman, who, in order to release switchman caught between car couplings, ordered engine coupled to cars and thereby aggravated his injuries, was not negligent because in the emergency he did not choose another method that would probably have resulted in less injury.

2. **Master and servant ⟨⟩278(6) — Evidence held not to show negligence in releasing switchman caught between couplings.**

Employés in attempting to release plaintiff switchman, caught between defective couplings of cars, *held* under evidence not negligent.

3. **Appeal and error ⟨⟩1068(5)—Refusal of instruction that no damages to be allowed for negligent backing of locomotive into cars to free plaintiff not error in view of evidence.**

In action for injuries sustained in coupling cars by reason of defective coupling, refusal of instruction that jury were not to allow damages for increased injuries received as sole result of negligent backing of engine into cars for purpose of releasing plaintiff was not reversible error, where evidence failed to show that employés, in so attempting to free plaintiff were negligent, and if such charge had been submitted to jury they would probably have found no negligence.

4. **Negligence ⟨⟩62(1)—No liability if "sole cause" of injury is unforeseen act having no causal relation to defendant's act; "sole."**

A negligent defendant is relieved of liability if the sole cause of the injury was an unforeseen act or omission, independent of and having no causal relation to the wrongful act or omission made the foundation of the action;

"sole" being defined as "single, separate, the opposite of aggregate."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Sole.]

**5. Master and servant ⚖➔129(6)—Employé entitled to damages for injuries to which defective appliance contributes in whole or in part.**

Under federal Employers' Liability Act, an employé is entitled to recover damages for all injuries received by him to which a defective safety appliance contributes in whole or in part.

**6. Master and servant ⚖➔129(6)—Act of foreman in ordering engine to couple with car held natural consequence of defect in coupling causing original injury.**

In action for personal injuries sustained in coupling cars, instruction not to allow damages for injuries received as sole result of negligent act of defendant's employés in backing engine into cars for purpose of releasing plaintiff was properly refused, inasmuch as such attempted release was a connected and natural consequence flowing from the defects in coupling and attachment which caused plaintiff's original injuries, and damages could not be diminished because such attempted release aggravated plaintiff's injuries.

**7. Damages ⚖➔132(8)—$18,000 held not excessive for crushed and broken arm.**

Verdict for $18,000 for crushed and broken arm, permanently incapacitating plaintiff, necessitating two operations, causing continuous pain and suffering because bones had not united, *held* not excessive in view of evidence that plaintiff was an uneducated man, unable to follow any employment save that in which he was employed at time of injury, and that his life expectancy was more than 27 years, and his earnings before injury $2,200 per year.

Dunklin, J., dissenting.

Appeal from District Court, Tarrant County; Bruce Young, Judge.

Action by J. W. Williams against the Fort Worth & Denver City Railway Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Thompson, Barwise & Wharton, of Fort Worth, for appellant.

Jones, Sexton, Buck & Jones, of Fort Worth, for appellee.

CONNER, C. J. Appellee, Williams, instituted this suit against the appellant, the Fort Worth & Denver City Railway Company, to recover damages alleged to have been sustained by him as a result of injuries received while working as a switchman for appellant in its switchyards in the city of Fort Worth. In the petition, appellee alleged, in substance, and in so far as pertinent to the questions presented and discussed, that at the time he was injured he was engaged in interstate commerce and occupied in switching a car used for purpose of such commerce; that the car or cars which at the time it was his duty as switchman to operate were not equipped with couplers that would couple by impact when cars were brought together, without necessity of a person going between them to make said coupling, as required by the act of Congress; that his injuries were caused by appellant having violated said safety appliance laws and the applicable laws of Interstate Commerce Commission, in that the drawhead on one or both of the cars that he was working with was loose, insecure, and out of line, so as to prevent the cars from coupling when they were brought together; that the lift lever on one or both of said cars that he was working with was defective and out of repair, and that the same did not allow and require the lift pin to drop into place so as to hold the knuckle when the coupling was made and was in such condition that a man had to place a portion of his body between the cars; that the knuckles of the coupling appliances on the cars in question were out of repair, in that they did not remain open and in line so as to make the coupling when the cars were brought together, and that they could not be manipulated by the lever without the necessity of a man going in between the cars to make the coupling; that the shaft or shank of the drawhead and that part of the car or draft rigging and the supporting timbers and appliances which should hold the same were old, worn, decayed, defective, and out of repair.

Appellee alleged that as a result of the foregoing he was required to go in between the cars at the time he was injured and attempt to adjust or fix the couplers so the couplings would make, and that he was injured as a result of the defects alleged. Appellee further alleged that his injuries were caused by appellant's agents, servants, and employés negligently causing the cars to be brought together in the manner and with the result hereinafter noticed, in the course of this discussion, and negligently failed to give him any warning or signal that the cars were going to be brought together. Appellee alleged that while endeavoring to couple the cars in question his left arm was caught and badly crushed and mangled; that the bones therein were broken; that some of the bones have not and will not reunite; that his left arm is shorter than his right arm; that by reason of his injuries he has lost much time, and his ability to earn money in the future has been greatly decreased; that he has been required to submit to several serious operations, and has suffered great mental pain and anguish; that his left arm has been permanently injured and destroyed; that at the time of his injuries he was approximately 40 years of age, and was earning and capable of earning $175 a month; and he sued for damages in the sum of $50,000.

---

⚖➔For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Appellant's answer, in addition to including a general demurrer and a number of special exceptions, contained a general denial and a special plea that it was not guilty of the negligence complained of, and denied that the negligence, if any, was the proximate cause of appellee's injuries. Appellant further pleaded that appellee's injuries were the result of risks ordinarily incident to the work he was engaged in, and that he was guilty of negligence in going between the cars at the time and place he did. But, inasmuch as no question is raised on this appeal relating to the issues of assumed risk and contributory negligence, they will not be further noticed. The defendant admitted that the parties were engaged in interstate commerce.

Appellee's evidence was to the effect: That on May 12, 1922, he was employed in the service of the appellant company as a member of a switch crew, of which one Taylor was the foreman and J. T. Parven, N. Spivey, and appellee were the remaining members. That they had a switch engine that assisted in the work. Their work was the making up and breaking up of trains. Trains with from 10 or 15 to 110 cars came into the yards. Some of those cars would stop in Fort Worth, and some would go to connecting lines out of Fort Worth. After a train came into the yard, the switch crew takes charge of it and parcels out the cars to such industries as they belong to in Fort Worth and to such connecting carriers as those that go away from Fort Worth. In doing this the cars would be placed upon different switch tracks, of which there were a number in the yards, and later gathered up in their order of further transportation. At the time of the accident, the switch engine had "kicked" three cars up the main line to a point in the yards where the line declined slightly towards the north, and when the cars were kicked on it, as were the three cars, it was necessary for the switchmen to either get on top of the cars and set the brakes or to "chunk" the wheels so as to prevent them from moving back towards the north. This appellee did when the three cars mentioned were kicked in on the main line. Shortly thereafter another car, a coal car, was kicked in on the main line, and it was appellee's duty to couple it to the other car, or rather in such cases the cars were supposed to automatically couple together in the operation of the automatic couplers with which the cars were equipped. On the occasion in question, when the second or coal car was kicked in on the main line, its impact with the three cars previously kicked in on this line was such as to knock the three cars back up the track some 10 or 12 feet; the automatic couplers having failed to operate. Appellee then went to the north end of the coal car and chunked the wheels so as to prevent it from rolling back north. He then went to the south end of the car and observed that the coupler was out of line, and he then took hold of the lift lever on the outside of the end of the car and with it endeavored to work the knuckle in the drawhead, but was unable to adjust the knuckle in that way. He then passed in between the rails and while endeavoring to adjust the knuckles another car or cars were kicked in on the main line and struck the coal car which knocked him out of balance, and he threw his left arm out and onto the knuckle, at which moment the three cars which had first been kicked in on the main line rolled down and caught his arm, breaking one or more bones, and held the arm so that he was unable to extricate himself. Upon the breaking of his arm appellee cried out, and Taylor, the foreman, who happened at the moment to be standing nearby, immediately called out to Spivey, who was coupling and uncoupling cars which the engine moved, to bring up the engine and release appellee. Some yardmen congregated at a nearby switch station also heard the cry, and they, without direction to so do, secured some crowbars and started toward the place of the accident with the purpose of releasing appellee by placing the bars under the wheels and "pinching" or moving the car by leverage. Before these yardmen arrived, however, the switch engine approached and coupled onto the north end of the coal car and further crushed and mangled appellee's arm.

The court gave approved definitions of "negligence," "ordinary care," and "proximate cause," and submitted the case to the jury upon special issues, which, together with the jury's answers thereto, so far as necessary to state, are as follows:

"Question 1: Was the coal car which plaintiff was attempting to couple when injured, equipped at the end thereof where he was injured, with a coupler that would not couple automatically by impact? Answer: Yes.

"Question 2: Were the drawheads, knuckles, pins, and levers on the said coal car upon which plaintiff was working when injured in such condition that they could not be adjusted so that the cars could be coupled automatically by impact by the reasonable use of said levers on such cars without the person attempting to make the coupling getting between the cars? Answer: Yes.

"Question 3: If you have answered either or both of the above questions in the negative, you need not answer the following question, but if you have answered said question in the affirmative, then you will further state whether or not such condition of the appliances was the proximate cause of the plaintiff's injuries? Answer: Yes.

"Question 4: If you have answered questions 1, 2, and 3 in the affirmative, you need not answer any of the following questions, except question No. 9."

Issue No. 9 required a finding of the amount of appellee's compensation in the event the findings to questions 1, 2, and 3 were answered in the affirmative. Questions 5, 6, 7, 8, and 10 relate to issues presented in the pleadings of negligence on the part of appel-

lee's coemployés and of contributory negligence on appellee's part, but no material question is presented relating to these issues, which were excluded by the court charge. Nor do we think any serious complaint can be made that the evidence fails to sustain the jury's finding in appellee's favor in answer to questions 1, 2, and 3. The question appellant most urgently presents arises under an assignment and proposition complaining of the court's rejection of the following special charge, to wit:

"Gentlemen of the jury, You are instructed that in arriving at your verdict in this case you will not allow plaintiff any damages for any injuries that he received as a sole result of the negligent, if any, backing of the engine into the cars for the purpose of releasing plaintiff at the time and place in question."

By act of March 2, 1893, ch. 196, § 2, found in the United States Compiled Statutes, § 8606, Congress provided that after the 1st day of January, 1898, it should be unlawful for any common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not "equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

The gist of the complaint of error in the court's charge in rejecting the special charge above quoted is that the jury, in considering special issue No. 9, by which they were to be guided in ascertaining appellee's damages in event of an affirmative finding in answer to special issues 1, 2, and 3, is that the jury were thereby permitted to consider and assess damages for the increased injuries caused by the crushing of his arm when the engine coupled onto the north end of the coal car for the purpose of releasing appellee. It is insisted that this charge should have been given, for the reason that appellee in his pleadings had alleged that said coupling was negligently done, and had introduced evidence in support of such allegations, and thereafter abandoned the issue. It is to be noted that the requested charge and contentions thereunder are predicated on the assumption that the pleadings and evidence raises the issue of actual negligence that, independently of all other causes, resulted in appellee's permanent injuries. In other words, that, had the charge been given, the jury in obedience to its terms would not have been required to apportion and deny damages for the increased injuries caused by the backing of the engine, unless such backing of the engine against the car was done under circumstances constituting negligence.

It is true appellee's pleadings alleged negligence in this respect, but they were denied on appellant's part, both generally and specially, and withdrawn from the jury by the court's charge after the introduction of the evidence relating to the subject, which, briefly and in substance, was, as already indicated, to the effect: That during the switching operations of the day three cars had been kicked in on the track upon which appellee was working. That he had chunked the wheel to keep the cars from rolling back north, when the switch engine immediately thereafter kicked in on the same track the coal car, which, coming in contact with the three cars already on the track, moved them some 10 or 15 feet to the south. Appellee then chunked the wheel at the north end of the coal car to keep it from rolling back to the north, and went to the south end of the coal car where he found the coupler defective, and, while trying to adjust the coupler so that it would automatically couple with the three cars formerly switched onto the track, and which were then slowly approaching, and that while so endeavoring to adjust the coupler on the coal car, yet another car or cars were kicked in from the north which struck the coal car, disturbing appellee's balance, and in his effort to regain his equilibrium instinctively threw his left arm on the knuckle of the coal car, at which moment the three cars from the south approached and caught his arm, and, upon appellee's outcry, Taylor, the foreman, called to Spivey, the switchman on the engine, to bring the engine up and couple onto the coal car and thus release appellee.

It seems difficult to conclude that this evidence even raises the issue of negligence in the effort to release appellee's arm by coupling the engine to the coal car. There was most naturally some excitement when appellee's arm was caught. He testified:

"I hollered, and when Taylor hollered he was close enough to me that he could see that I was caught, and he hollered at Spivey and says: 'Jesus Christ, we have got Jack caught here. Come against them cars with the engine and pull them off of him.'"

[1] Negligence was clearly defined in the court's charge, and can it be reasonably said that Taylor's instinctive cry and direction to bring up the engine and withdraw the coal car constitutes negligence? We can hardly think so. The fact that the employés were approaching with crowbars to move the car by leverage on the wheels, and that this would have relieved the pressure on appellee's arm and avoided the additional injury, does not alter the case. It appears that the employés with the crowbars had their attention called to appellee having been caught by an outcry of another switchman, and that thereupon they instinctively and without direction from any one in authority proceeded from the switch stand, before mentioned. It does not appear that Taylor had any knowledge of the approach or purpose of such employés, or that he had such knowledge of the precise way appellee's arm was impinged, or

of the extent of his pain and peril as to require him, in the exercise of due care, to stop, deliberate, determine, and direct the way that now appears would probably have resulted in less injury. To require such strictness of action in the midst of the excitement of the moment seems to us to be unreasonable.

[2] Nor do we think the most liberal construction of the evidence in appellant's favor authorizes the conclusion that the operatives of the engine or the switchman who made the coupling to the coal car was guilty of negligence. The switchman, Spivey, who was called to testify in behalf of appellant, in stating the character of coupling of the engine onto the coal car, said:

"If it moved the cars when we coupled into them, I did not see it; we came back as easily as they could possibly be coupled on. [His other testimony shows that he was the man standing on the footboard of the engine when it came back and made the coupling.] * * * I hollered at Mr. Marshall, the engineer, when he came back and told him that Mr. Williams was caught in the cars. I don't know whether he heard me or not, but that is what I hollered and told him, and so when he come agin the cut of cars, it seemed to me that he come agin them just as easy as they could be coupled into."

[3, 4] We have been pointed to no other evidence, and have found none in our examination of the statement of facts which tends to show that the engineer and switchman, in making the coupling in question, acted otherwise than with due care. So that, on the whole, we conclude that it is altogether improbable that, had the special charge under consideration been given, the jury would have found that either Taylor or appellee's coemployés were guilty of negligence in the respects referred to, and it was only in such event, under the terms of the special charge, that the jury would have been required to apportion and diminish appellee's damages.

So too the conditions of the charge, as well as of the law, required a finding that the backing of the engine was the sole cause of the increased damage before the entire damage should be diminished. The term "sole" is defined in Black's Law Dictionary as "single, separate, * * * the opposite of aggregate." We have found no better definition applicable to the subject under consideration. It implies an entire want of connection of co-operation with the wrongful act or omission causing the injury. If the injury be caused wholly by an unforeseen act or omission, independent of and having no causal relation to the wrongful act or omission made the foundation of an action, then the result must be attributed to the independent cause, and the original wrongdoer is relieved.

In Thompson on Negligence, vol. 2, p. 1063, c. 22, under the head of "Proximate and Remote Cause," numerous cases are cited illustrating the principles in mind. The first case cited by the author is an English decision cited as illustrating the rule to be applied in cases where the injury is the combined result of negligence and accident. In that case it was held, as stated in the headnote, that:

"A's vessel, owing to the negligence of its crew, founders upon a sand bank, and, becoming unmanageable, is driven by wind and tide upon a sea wall of B., which it damages. A. is liable for this damage to B. But, if the vessel had foundered without fault of the crew, A. would not have been answerable to B. for those damages caused by the vessel to the sea wall, during the time necessarily consumed in breaking her up and removing her cargo."

On page 1067 of the same volume, the author cites a Massachusetts case in which there was a concurrence of an unlawful act with extraordinary and unforeseen cause. The general statement of the doctrine in such case is thus given in the headnotes:

"A. does an act which is prohibited by law. Subsequently an extraordinary and unforeseen cause intervenes, which, combined with this unlawful act of A., results in damage to B. A. is answerable to B. for this damage. A.'s sign hung over a street in a city, with due care as to its construction and fastenings, but in violation of a city ordinance, which subjected its owner to a penalty for placing and keeping it there, was blown down by the wind in an extraordinary gale, and in its fall, a bolt which was part of its fastenings struck and broke a window in a neighboring building. Held, that the owner of the sign was liable for the injury to the window."

The author, after a review of the cases in his notes, found on pages 1084, 1085, concludes that the general rule is that:

"Whoever does a wrongful act is answerable for all the consequences that may ensue in the ordinary and natural course of events, though such consequences be immediately and directly brought about by intervening causes, if such intervening causes were set in motion by the original wrongdoer."

And that:

"Where the injury is the combined result of the negligence of the defendant, and an accident for which neither the plaintiff nor the defendant is responsible, the defendant must pay damages, unless the injury would have happened if he had not been negligent."

And again the author says:

"If the doing of a particular act is forbidden by law, and an agent for which the defendant is not responsible intervenes, and, conjoining with the defendant's unlawful act, but without negligence on his part, produces an injury, he will be responsible."

In the case of St. Louis & S. F. Ry. Co. v. Doyle, 25 S. W. 461, by the Court of Civil Appeals at Dallas, it was said, quoting from the headnotes:

"Where a brakeman's foot was crushed by defendant's negligence, and the brakeman allowed

its amputation, on the advice of defendant's surgeon, the amputation was the result of defendant's negligence, and whether or not the physician made a mistake was immaterial."

The case of Travelers' Ins. Co. v. Hunter, also by the Dallas Court of Appeals, 30 Tex. Civ. App. 489, 70 S. W. 798, writ of error refused, was a suit upon an accident policy, in which it was contended that the death of the insured was the result of rheumatism instead of an accident. It was held that, if the accidental injury caused the rheumatism, recovery could be had on the policy, even though rheumatism might have produced the death.

The test applied in the ruling case of T. & P. Ry. Co. v. Bigham, 90 Tex. 223, 38 S. W. 162, was:

"Was there an unbroken connection? Would the facts constitute a continuous succession of events so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application. But it is generally held that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances."

[5] Under the federal Employers' Liability Act, and decisions thereunder, the employé is entitled to recover damages for all injuries received by him to which a defective safety appliance contributes "in whole or in part." See sections 8612, 8613, 8657, 8659, 8660, U. S. Comp. St., from which we have taken one quotation. Among other statutes intended for the protection of employés engaged in interstate commerce is one which requires railway companies to supply their locomotives with "driving wheel brakes." A case arising under this statute is that of Union Pac. Ry. Co. v. Huxoll, 245 U. S. 535, 38 S. Ct. 187, 62 L. Ed. 455. Huxoll was an engineer who was run down by an engine of the company while he was working on the railway company's track, under circumstances constituting contributory negligence on his part. His presence on the track was obscured by steam and smoke which at the time enveloped the track, and he was not discovered until struck by the tender of an approaching engine and knocked down and dragged under the tender. There was evidence introduced to the effect that the engine which struck him and inflicted the injury which later resulted in his death was not equipped with sufficient power brakes. The question before the court was whether the power brake on the engine was in working order at the time of the accident, and, if it was not, did this defect contribute "in whole or in part" to cause the death of Huxoll. Mr. Justice Clarke, in rendering the opinion of the court, used the following language:

"Considering this conflicting testimony in the aspect of it least favorable to the company, as we must on this review, it results that there is evidence tending to show, that while the engineer did not see the man struck, he was notified almost instantly by a call to stop from the one witness who says he saw him struck, and that if the power brake had been working the engineer could have stopped his engine, running 3 or 4 miles an hour, 'almost instantly,' 'in 8 or 10 feet,' but that in fact it ran for approximately 135 feet after striking the deceased, with his body under the tender or engine almost the entire time. Demonstration is not required in such a case as we have here but responsibility for the accident must be determined upon the reasonable conclusions to be drawn from the evidence, and it is impossible for us to conclude that the conflict which we have thus described does not present evidence sufficient to justify the submitting of the case to the jury for its determination as to whether the deceased, who survived the accident for 15 hours, received injuries which contributed, in part at least, to the fatal result, during the time that the engine was being negligently run for a distance which there is evidence to show was at least 100 feet, with his body all the time being dragged and crushed between the frozen ballast of the track, the low-hanging attachments of the tender and the rods of the driving wheel brakes with which his body was found so entangled that it required 45 minutes to release him from his desperate situation."

[6] In the case before us, we think it plain that the direction of the foreman to couple onto the coal car to relieve appellee from his perilous position was a connected and natural sequence flowing from the defects of the coupler and attachments, on account of which appellee's injuries undoubtedly arose. And hence there is no reasonable ground for the contention that appellee's damages should be diminished because of the fact that the coupling increased the pressure upon his arm. In addition to the case of Union Pac. Ry. Co. v. Huxoll, see, also, the following cases cited in behalf of appellee: T. & P. Ry. Co. v. Rigsby, 241 U. S. 33, 36 S. Ct. 482, 60 L. Ed. 874; Grand Trunk Western Ry. Co. v. Lindsey, 233 U. S. 42, 34 S. Ct. 581, 58 L. Ed. 838, Ann. Cas. 1914C, 168; Johnson v. Southern Pac. Ry. Co., 196 U. S. 1, 25 S. Ct. 158, 49 L. Ed. 363; St. L. Iron Mountain & So. Ry. Co. v. Taylor, 210 U. S. 281, 28 S. Ct. 616, 52 L. Ed. 1061; St. L. & S. F. Ry. Co. v. Conarty, 238 U. S. 243, 35 S. Ct. 785, 56 L. Ed. 1290; Railway Co. v. Gotschall, 244 U. S. 66, 37 S. Ct. 598, 61 L. Ed. 995; Railway Co. v. Layton, 243 U. S. 617, 37 S. Ct. 456, 61 L. Ed. 931; N. Y. Central Ry. Co. v. Winfield, 244 U. S. 147, 37 S. Ct. 546, 61 L. Ed. 1045, L. R. A. 1918C, 439, Ann. Cas. 1917D, 1139; Atlantic City Ry. Co. v. Parker, 242 U. S. 56, 37 S. Ct. 69, 61 L. Ed. 150.

Before closing this branch of the discussion, it may not be inappropriate to observe that, if there was any negligence at all in bringing up the locomotive and coupling onto the coal car in order to relieve appellee of

his painful situation, it was undoubtedly the negligence of Taylor, the foreman of the switch gang, in giving the direction for the engine to make the coupling, and for which negligence and its consequences appellant would be liable. In no event therefore can it be said that the court committed prejudicial error in refusing to give the charge, which indeed, as we think, had it been given, would have been confusing and incorrect as applied to the circumstances of this case.

[7] The remaining question that we deem material arises under those assignments and propositions which question the amount of the verdict. It is contended that the verdict is excessive. It is not clear that we can give the evidence in a brief form that will fully portray appellee's injuries, but his evidence, in substance, was to the effect that when his arm was first caught between the knuckles of the cars, as hereinbefore detailed, one or more of the bones in his left arm were broken; that when the engine was coupled to the coal car there was increased pressure which crushed his arm and cut it in two, except two ligaments and a little string of flesh; that the injured arm is about two inches shorter than the other one; that his arm was caught between the couplers, with the thumb up, and the arm was mashed between the couplers; that he went to the hospital several times, the first time he was there about six weeks. He further testified:

"The evening I went to the hospital, they just wrapped my arm up. Dr. Bacon Saunders was there. He was in the operating room, and I was begging him not to cut it off. He just wrapped it up, and the next morning they came out, and he put a rubber tube—there was one coming in this way—from my hand down this way, and then one coming in from the elbow down. The one that come in this way (indicating) come out right here in the arm. Then they bandaged it up with gauze or cotton and one thing and another, and every two hours they would inject some fluid of some kind into it—had a syringe about that long, and the fluid would go in this tube, for 3 days, I believe it was, and 2 nights. The tubes were perforated, full of holes, you know. The nurse injected that fluid in there, and they kept those tubes in there for 3 days and 2 nights, I believe it was. After that, he taken me up in the operating room, and he taken several stitches in here, sewed it and pulled it back together, like that (indicating), and taken several stitches in there—I don't remember exactly how many. He wouldn't let me look at it, only just as I would turn my head and look at it, anyhow, and then he put it in a plaster paris. To the best of my recollection, it remained in the plaster paris about 8 or 9 days, something like that, and he dressed it and cut that cast off of it.

"The day I was hurt, it caused me suffering or pain. I suffered when I went to the hospital too, every day and every night. During the 8 or 9 days my arm was in the plaster cast, I suffered. They gave me rest powders every night. They wanted to give me hops, but I wouldn't take them, but they gave me 2 or 3 anyhow. I suffered an awful lot.

"At the end of about 9 days, he cut the plaster cast off of there, and then he cut it down this way. He kept the bottom part of it to go on my hand, on my arm, but it had an opening in here so that he could dress it. The cast was cut something like half in two. He kept the bottom part of it here and he throwed the top part away, and then he would put gauze in that cast and one thing and another, and they put my arm in there, and the cast run from my elbow out to the end of my fingers. I wore that quite a while after I got out of the hospital.

"On the 15th day of last January was a year ago, I went back to the hospital for another operation.

"About 3 days after I was hurt they put the cast on, and that cast was kept on there for about 9 days, and then they slit it up, as I have indicated, and then they would dress it every 2 or 3 or 4 or 5 days up until the time I left the hospital. The arm had not cured up when I left the hospital, and I went to the doctor's office, in the Flatiron building, and they dressed it there; for a while I went every 2 or 3 days, sometimes, and later on I didn't go but once a week. I kept that up until the January following. I was hurt on May 12th, and on the 15th of the following January I went back to the hospital. The arm had not cured up in that time. When I went back to the hospital in January, Dr. Bacon told me he would split the arm open and take a piece of bone out of my shin and put it in my arm. That was the operation I went there for.

"During all the time up to January, I had been treated from time to time, and I was following the instructions they gave me all the time. They made an X-ray of my arm out at St. Joseph's infirmary. I can't say how long that was after I was hurt, but possibly a week or 10 days. After I was out of the hospital and went home, they made another X-ray up in the Flatiron building. Dr. Bond made 2 or 3 there. Dr. Roy Saunders, a railroad doctor, took me there to have them made. During all of that time, my wounds had not cured up. There was pus still all up here, clear down to here, and there was little holes through there, and bones were working out all the time. That pus started before I left the hospital, and it had kept up to January 15th. Those holes and places were right along in there, up there—just holes in there and pieces of bone working out.

"In January I went to the hospital to undergo an operation, at the suggestion of Dr. Bacon Saunders. When I went there the nurse shaved my leg from the knee down, and washed it off with ether, and painted it with iodine, and just as soon as they got through with that part of my leg, they went to giving me the ether. When I waked up, my arm was in a plaster cast. I knew they had worked on it, but they hadn't done anything to my leg. I had not lost any shin bone, they really didn't take out any of the shin bone.

"It must have been 8 or 10 days before the plaster cast that was put on my arm while I was asleep was taken off, and when it was taken off there was a scar there that long—about 6 inches long, I guess—up and down the arm. They split it up this way, on top and un-

derneath also. Further than that scar, I don't know what was done. Up to that time, the bones in my arm had not reunited. After that operation, in about 9 or 10 days, they dressed the arm, but I wore the plaster cast for a long time—something like 60 days I suppose. When they took it off, my arm was not cured up, and the bones had not reunited. During all the time, from the time I was hurt, up to January, 1923, when this operation was performed on me, and the bones were working out—something like 8 months, I should say—it was painful. It hurt night and day all the time. I never had any ease at all, you might say.

"After this operation was performed, and they finally took the cast off, in about 60 days, the bone had not reunited, and the wound had not cured up, and the pus had not quit coming from it. There were no more operations performed on me, and I did not go to the hospital any more. They wanted to take me out there again, but I didn't go. I had another doctor to examine my arm—Dr. J. M. Givens. I can't give the date that he examined the arm, but it was the same time that Dr. Saunders told me he wanted to take a piece of bone out of my shin and put it in the arm. I went right straight to Dr. Givens' office and asked him what he thought about it. That was before the last operation that Dr. Givens examined my arm. I have had X-ray pictures made of my arm; I can't say the date, but it was several months ago. The X-ray pictures that are now shown me are the ones I had taken; it was about November 26, 1923, when they were made. The bones in my arm have not reunited at this time.

"Q. There is a loose joint there at the place where it was crushed? (Witness indicates.) There is a catch right in there—the two bones there, they catch, and whenever they do it hurts. I keep pulling at my hand all the time on account of the pain, the fingers draw, the thumb draws down, and the fingers cramp. The thumb will draw down that way, and the fingers cramp right in here, and it feels like there was a band right tight around here. The ligaments are all tight. That is the reason I pull at it. To put it out this way, stretch it out, relieves it to a great extent. I have not quit suffering with the arm. It pains practically all the time. Sometimes it is worse than others, but there is never a day or night that I am not in misery with it. It has done that ever since I was hurt. It still throws off pus yet. The scar on the inside, where I indicate with my finger, there is pus coming out of that right now. Sometimes it scabs over, and when it does it hurts worse than it does when it is open. When it is open, that is about the best relief that I can get out of it. There is less pain when it is open and draining than there is when it is closed."

Appellee further testified that he was 41 years old, practically raised upon a farm; that he cannot do any manual work; that his education was very poor, as he was raised an orphan. There was evidence further tending to show that appellee's injuries are permanent; that the life expectancy of a man 40 years old is 28.8 years, and of a man 41 years old 27.45 years; that the year previous to appellee's injury, to wit, 1921, his income was a little more than $2,200. And it is not unreasonable, perhaps, to infer that continued life and ability to work would afford opportunities for advancement and an increase in wages.

Mrs. Williams testified to the effect that appellee, because of the pain suffered by him, rarely, if ever, was able to sleep all night; that frequently he would arise and walk the floor and not sleep more than one hour the entire night.

The verdict and judgment for $18,000 seems large, and we are not entirely agreed that it is not excessive, but, in view of the fact that the question is one so largely within the discretion of the jury, and of the further fact that no circumstances are cited or presented in this record, so far as we have been able to observe, which tends to show that the jury who assessed the damages in this case were influenced by any feeling of prejudice or other improper sentiment, the majority have concluded that we cannot disturb the verdict. In behalf of appellee, numerous cases are cited in support of the amount of the verdict and judgment in this case, which are as follows: Wells Fargo & Co. v. Benjamin (Tex. Civ. App.) 165 S. W. 127; Ry. Co. v. Brouillette, 61 Tex. Civ. App. 619, 130 S. W. 886; Railway Co. v. Nesbit, 43 Tex. Civ. App. 630, 97 S. W. 826; Railway Co. v. Pope, 43 Tex. Civ. App. 616, 97 S. W. 535; Railway Co. v. Kelly, 34 Tex. Civ. App. 21, 80 S. W. 1074; Oil Co. v. Snell, 47 Tex. Civ. App. 413, 106 S. W. 171; Railway Co. v. Gray (Tex. Civ. App.) 137 S. W. 729; Railway Co. v. Abbey, 29 Tex. Civ. App. 211, 68 S. W. 293; Ehrman v. Brooklyn City R. Co., 131 N. Y. 576, 30 N. E. 67; Erickson v. Railway Co., 155 N. Y. 643, 49 N. E. 1096; Smith v. Whittier, 95 Cal. 279, 30 P. 529; Railway Co. v. Brogan, 105 Ark. 533, 151 S. W. 699; Railway Co. v. Webster, 99 Ark. 265, 137 S. W. 1103, 1199, Ann. Cas. 1913B, 141; Williamson v. Railway Co., 53 App. Div. 399, 65 N. Y. S. 1054.

Numerous other cases might be cited, but we find some difficulty in undertaking to harmonize them. It would seem that there is as little uniformity in the decisions of the courts on the subject as in the verdicts of the juries. Each case, apparently, is made to depend on its own peculiar circumstances, and from an examination that we have made of them, we find no certain rule by which we can say that appellee's damages are so great as to shock the conscience. It appears that he is an uneducated man, unable to follow any remunerative employment save that in which he was employed at the time of his injury, that he manifestly has long suffered continuous and great pain, and under all the circumstances the majority feel unable to disturb the verdict.

Several other questions have been presented in the brief of appellant, which we

have considered, but we do not deem them of sufficient materiality or importance to further extend this opinion by their discussion.

All assignments and propositions are accordingly overruled, and the judgment is affirmed.

DUNKLIN, J. (dissenting). In plaintiff's pleadings two separate and distinct causes of action were alleged: The first was based on alleged negligence of the defendant in furnishing cars without automatic couplers as required by the act of Congress; and the second was for alleged negligence in backing the cars in an effort to release his arm then pinioned between the couplers in such a manner as to cause him further injuries. Two separate and distinct injuries were alleged—one when plaintiff's arm was first caught between the couplers, and another when the operatives of the train attempted to release him by backing the cars as above indicated. According to plaintiff's pleadings and his own testimony, the second injury was different and distinct from the injury he first sustained, and of a more serious nature. In the opinion of the writer, there was evidence tending to support the second issue of negligence noted above, and I do not believe the court would have been authorized to peremptorily instruct the jury that the second charge of negligence had not been sustained, in view of the fact that the negligence of his fellow servants would be chargeable against the defendant.

While plaintiff withdrew his charge of negligence proximately causing the second injury, he did not withdraw evidence already introduced by him in support thereof. As shown in the decision of T. & P. Ry. Co. v. Bigham, 90 Tex. 223, 38 S. W. 162, and other authorities cited in the opinion of the majority, injuries which could not reasonably have been foreseen as the result of an act or omission constituting negligence cannot be held to be the proximate result of such negligence, warranting a recovery therefor. It is also a familiar rule that no one is required to anticipate negligence on the part of another. The railway company could not be charged with notice that the second act of negligence would probably occur as the result of injuries sustained by the first act. American Bridge Co. v. Seeds, 144 F. 605, 75 C. C. A. 407, 11 L. R. A. (N. S.) 1041.

The injuries occurring as a result of the second act of negligence would not be recoverable as the proximate result of the first act, since the same could not reasonably have been anticipated as a result of the first act. And especially is this true in view of plaintiff's withdrawal of his second charge of negligence. S. A. & A. P. Ry. v. Robinson, 73 Tex. 277, 11 S. W. 327.

In the opinion of the writer, the act of Congress making the defendant liable for an injury occurring in whole or in part from its failure to provide the cars with automatic couplers is applicable to the first cause of action, but cannot be made to apply to the second cause of action alleged in plaintiff's petition, which was based on another act of negligence, separate and distinct from the violation of the Safety Appliance Act, and for injuries separate and distinct from those sustained as the result of failure to equip the cars with automatic couplers.

For the reasons stated, the writer is of the opinion that the charge requested by the defendant and discussed in the opinion of the majority should have been given, and that the refusal of it constitutes reversible error.