## WATERMAN LUMBER CO. v. SHAW.

(Court of Civil Appeals of Texas. Texarkana. Feb. 13, 1914. Rehearing Denied March 19, 1914.)

1. APPEAL AND ERROR (§ 1002*) — VERDICT — CONCLUSIVENESS.

A verdict on conflicting evidence will not be disturbed on appeal merely because it is contrary to the testimony of the greater number of the witnesses.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3935–3937; Dec. Dig. § 1002.*]

2. MASTER AND SERVANT (§ 264*)—INJURY TO SERVANT—ISSUES, PROOF AND VARIANCE.

The variance between the petition, in an action for injury to an employé, alleging that the accident happened as the employé reached forward to unloosen a rail, so that it might go forward in the usual manner, and the evidence that the employé made one step in the direction of the end of the rail and was then struck by it as it swung around, was immaterial, where the allegations of the petition as to the particular conduct or acts causing the injury were substantially proved.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 861–876; Dec. Dig. § 264.*]

3. MASTER AND SERVANT (§ 180*) — FELLOW SERVANTS—"RAILROAD."

Where a lumber company, engaged in the manufacture and sale of timber, operated a railroad of standard gauge, extending 10 or 12 miles into the forest, with spurs, for the transportation of logs to supply its mill with timber, the railroad was within Rev. St. 1911, art. 6640, making persons operating railroads liable for damages to employés, caused by the negligence of other employés.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 359–361, 363–368; Dec. Dig. § 180.*

For other definitions, see Words and Phrases, vol. 7, pp. 5899–5908; vol. 8, pp. 7777, 7778.]

4. MASTER AND SERVANT (§ 182*)—INJURY TO SERVANT—"FELLOW SERVANT"—WHO ARE.

Where plaintiff, while performing with his men specified work, was subject to the orders of a coemployé, and plaintiff and his coemployé were under the general superintendence of a third person, plaintiff and his coemployé were not fellow servants, within Rev. St. 1911, art. 6641, defining vice principals.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 371, 372; Dec. Dig. § 182.*

For other definitions, see Words and Phrases, vol. 3, pp. 2716–2730; vol. 8, p. 7662.]

5. DAMAGES (§ 158*) — PERSONAL INJURIES — PHYSICAL AND MENTAL PAIN.

One suing for a personal injury, resulting in his leg being broken by a violent blow and the subsequent amputation of the leg, need not allege that he suffered physical and mental pain, in order to recover damages therefor, but it will be inferred as the natural consequence of the physical condition.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 441–444; Dec. Dig. § 158.*]

**6. DAMAGES (§ 216*) — PERSONAL INJURIES — PHYSICAL AND MENTAL PAIN.**

A petition for personal injuries, which alleges that plaintiff's leg was broken by a violent blow, and was subsequently amputated, that he was confined to his bed for more than four months, that he suffered great pain, that the leg refused to heal, necessitating amputation, and which does not allege that the wound had healed at the time of the trial, authorizes a charge permitting a recovery for any physical and mental pain plaintiff may suffer in the future.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 548–555; Dec. Dig. § 216.*]

**7. NEGLIGENCE (§§ 59, 136*)—QUESTION FOR COURT AND JURY.**

To create actionable negligence, the circumstances must have been such that the wrongdoer should have anticipated that an injury of some character would probably result from his negligent act, and the question whether the consequences should have been anticipated is for the jury only when the evidence is such that the jury could properly find for the wrongdoer.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 72, 277–353; Dec. Dig. §§ 59, 136.*]

**8. MASTER AND SERVANT (§ 97*)—INJURY TO SERVANT—NEGLIGENCE.**

Where an employé, engaged in removing rails from a railroad track and assisting in loading them on cars, was injured by being struck by a rail when moved by the engineer in charge of the hoisting appliance, and it appeared that the engineer knew that the rail had been caught in some way and continued applying the steam to force it loose, and that he always gave the men time to get out of danger, and that he asked the employé to stand out of the way as he might be injured, the injury was one to be anticipated by the employer as a matter of law.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 163; Dec. Dig. § 97.*]

Appeal from District Court, Harrison County.

Action by Lucian Shaw against the Waterman Lumber Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Young & Stinchcomb, of Longview, and F. H. Prendergast, of Marshall, for appellant. Beard & Davidson, of Marshall, for appellee.

HODGES, J. This appeal is from a judgment in favor of the appellee against the appellant for the sum of $5,000 awarded as damages for personal injuries. The appellant is a private corporation engaged in the manufacture and sale of lumber. In connection with its sawmill it owns and operates a railroad extending 10 or 12 miles into the forest, for the purpose of transporting logs and supplying its mill with timber. This railroad is of the standard gauge and has several branches, or spurs, leading off from the main line in different directions. The rolling stock used in the operation of this railroad consisted of a shay locomotive and a number of flat cars adapted to the carriage of logs, iron rails, and cross-ties. In

June, 1912, the appellee, Lucian Shaw, was in the service of the appellant as the foreman of a gang of men employed to keep the track in repair. On the date of his injury he and his crew were engaged in taking up and removing a spur track. A train consisting of the locomotive, three flat cars, and a car on which was constructed what is termed a "loader" was carried out to the place of work for the purpose of transporting the ties and rails to another part of the line. It was the duty of the appellee and his men to first draw the spikes, loosen the rails, and place them near the outer edge of the ties. The loading machine was under the immediate supervision of W. T. Gill, another employé. Gill was also the engineer of the train, and had charge of that branch of the service. The manner in which the work was performed is thus described: The train of flat cars and the loader had been carried out to the spur track. This track extended east and west; the west end being connected with the main line of the railway. The employés began by taking up the track from the east end, and continued towards the west until they got to the place where the appellee was injured. The steam loader was operated by an engine of its own. It had a cable that extended out over a derrick that worked from one side of the track to the other. This derrick extended out and at its proper elevation about halfway over the car next to it, and was adjusted so that it could lift ties on the side of the track and be turned towards the front of the train and place them on the tie car. The derrick could also pick up the rails on the side of the "steel car," and could then be swung over the middle of the car in such a way as to place the rails in position on the car. The train was stopped after being run out to a convenient distance on the spur track, and the appellee and his men pulled the spikes from the crossties and took the bolts from the angle bars, thus disconnecting the rails, and pulled them back and out in such a way that they could be handled. They would then take the cable of the loader and fasten it around the rails or the ties, as the case might be, give the signal to Gill, who was operating the engine of the loader, and the material would be hoisted into place. The appellee testified that, when he got to the work the morning he was injured, he and his men commenced pulling the spikes and getting ready to take the steel up. It was his duty to see that the cable was fastened around the rails or ties, and to give the signals to Gill to start and stop the loader engine when hoisting the ties or the rails. They had been loading steel and ties all the morning, and resumed work in the afternoon. Appellee called one of his men and told him to tie the cable to a rail which they were preparing to elevate to the car. After the cable had been fasten-

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

ed, appellee gave the signal to Gill, and the machine started. The front end of the rail, or the end next to the car, became fastened between the angle bars of the next rail, and the rail being handled could not be elevated.

Appellee thus testifies: "Mr. Gill made several surges on it, and I flagged him to stop. He slacked up, and I said, 'All right, boys, let's get him loose;' and by that time he made another pull, and the rail flew around and struck me on the ankle. I flagged him by dropping my hands down by my side. When he received that signal it was his duty to stop. He stopped when I first signaled. When he stopped I said, 'All right, boys, let's get him loose;' and I made one step, and by that time he snatched up again. When he snatched up that time I had not given him the signal to stop. It was his duty to stop until I got the rail loose, and until I gave him a signal to start. I gave a signal to start by holding my hands above my shoulders and shaking them, and give a signal to stop by dropping my hands to my side. When he gets the signal to start it is his duty to pull on the rail, and when he gets the signal to stop it is his duty to stop until he gets another signal to start."

Appellee was corroborated in the main by one other witness. Gill testified that the cable in this instance had been fastened to the center of the rail instead of at the end, as had been the custom; that, when he started his machine at the signal given him by Shaw, he was unable to raise the rail on account of its having become entangled in something. He thought that it had caught in a rotten tie, and continued to apply the steam. He denies that Shaw gave him any signal to stop; says that he was looking at Shaw all the time, and that he saw no signal. He further testified that Shaw, without giving him any notice, walked within reach of the rail and was injured. Gill was corroborated by a number of the other employés who were present at the time.

The evidence is undisputed that, after Shaw stepped toward the rail in the manner described by him, he was struck just above the ankle and his leg broken. He was afterwards carried to a hospital, given medical treatment, and the leg was subsequently amputated somewhere between the knee and the ankle. Shaw was at the time about 42 years of age, and had prior to the injury been a stout, able-bodied man.

[1] At the conclusion of the testimony, the appellant requested the court to instruct a verdict in its favor, which was refused. It is claimed that the great weight of the evidence showed that Shaw never gave any stop signal to Gill, and that he carelessly and recklessly walked within reach of the rail while the hoisting machine was still in operation. While the testimony of a greater number of the witnesses supports that con-

165 S.W.—9

clusion, there was sufficient evidence to warrant a finding to the contrary. The conflict presented a question for the jury, and we do not feel justified in setting aside the verdict.

[2] It is also contended that there was a variance between the facts alleged in the appellee's original petition as to the manner in which the injury occurred and the facts proven. The petition alleged: "That, acting upon the signal, the machine was stopped, and the plaintiff reached forward to unloosen the rail so that it might go forward onto the car in the usual manner, when said Gill negligently, unmindfully, and carelessly threw on the full force of the machine and jerked violently at the rail," etc. Shaw testified that, after giving the stop signal, he made one step in the direction of the end of the rail that was fastened, and was then struck by the end nearest to him as it swung around. The variance consists, it will be observed, in the particular situation Shaw was in and what he was doing at the time the rail struck him. The averments as to how the injury was inflicted (that is, what particular conduct or acts on the part of the appellant's employé caused it) were proven substantially as alleged. It is immaterial whether Shaw was in the act of remedying the trouble, or had just started towards the end of the rail for that purpose.

[3] Among other defenses interposed was that alleging that Shaw and Gill were fellow servants, and it is argued that this fact justified the peremptory instruction. In reply to that defense it is insisted by counsel for appellee that Shaw and Gill and their coworkers were engaged in operating a train of cars for a railroad within the meaning of article 6640 of the Revised Civil Statutes 1911, and that the fellow-servant doctrine has no application. It has been definitely decided by our Supreme Court more than once that a railroad such as that owned by the appellant in this instance comes within the provisions of the article of the statute referred to. Sullivan-Sanford Lumber Co. v. Watson (Sup.) 155 S. W. 179. We are not disposed, however, to hold that the men were at the time engaged in operating cars, within the meaning of the statute. T. & Ft. S. Ry. Co. v. Anderson, 102 Tex. 402, 118 S. W. 127; G., C. & S. F. Ry. Co. v. Johnson, 47 Tex. Civ. App. 74, 103 S. W. 447.

[4] But we think there is another sufficient reason for refusing the requested charge. Article 6641 is as follows: "All persons engaged in the service of any person, receiver, or corporation controlling or operating a railroad or street railway, the line of which shall be situated in whole or in part in this state, who are intrusted by such person, receiver, or corporation with the authority of superintendence, control, or command of the other servants or employés of such person, receiver, or corporation, or with the authority to direct any other employé in the per-

formance of any duty of such employé, are vice principals of such person, receiver, or corporation, and are not fellow servants with their coemployés." Shaw testified that, while performing this work, he and his men were subject to the orders and direction of Gill, although both he and Gill were under the general superintendence of a man by the name of Bogue. While this is disputed in part by Gill, the question became an issue of fact for the jury. If what Shaw stated was true, under the provisions of the article above quoted, he and Gill were not fellow servants. The court, therefore, was not authorized to give a peremptory instruction predicated upon the assumption that Shaw was not subject to the direction and control of Gill.

Upon the measure of damages, the court gave the following charge: "If you find for the plaintiff, Lucian Shaw, then, in fixing the amount of damages, you may take into consideration the nature, character, and extent of the injury that you may find from the evidence was sustained by Lucian Shaw, as the proximate result of the defendant's negligence, if any, any expenses for doctors' bills he has paid or obligated himself to pay as a result of said injury, and any physical suffering and pain, if any, that you may find from the evidence has been endured by the plaintiff as the direct result of said injury and negligence, if any, up to the time of this trial, and any physical and mental pain that he may suffer in the future as the direct result of said negligence, if any, and any time lost, if any, that you may find from the evidence has been lost by the plaintiff up to the time of this trial, and any diminished capacity to earn money in the future, if any, by reason of the negligence of the defendant, if any; and you will determine what amount of money, if paid in cash now, will fairly and reasonably compensate said plaintiff for said injury, if any, and make the same the amount of your verdict." Shaw testified on the trial that his amputated limb was still giving him trouble; that the end of it would swell and pain him, and was the seat of many unpleasant sensations.

[5, 6] Appellant contends that the portion of the charge quoted which authorized a recovery for any physical and mental pain that Shaw might suffer in the future was unwarranted because of the absence of any appropriate pleading. The petition contained the following averments as to the damages sustained: "That he remained in bed for more than three months and suffered untold agony and pain; that his limb refused to heal, so violent had been the blow, and it became necessary to amputate it, and the leg was taken off between the knee and the ankle. Plaintiff shows that he was confined to his bed and room for more than four months; that he nursed a broken limb that would not heal for more than 90 days; that

he suffered great and excruciating pain with said limb, and in having the same amputated; that he has become a cripple for life, and the great and excessive pain has preyed upon his physical system to a very great degree. He shows that it was necessary for him to employ a physician and to buy medicines and to secure a nurse at a great expense to himself in the sum of $200. He shows that he has lost five months' time of the reasonable value of $60 per month. He shows that his capacity to earn money in the future has been greatly depreciated, and that he is now, or was at the time of the injury, a man of only 42 years of age and in robust health; that he will have to go through life on one leg and as a cripple, and his earning capacity will be greatly depreciated and the length of his life shortened; that he has suffered with said limb, during his long-continued illness, great physical and mental pain and anguish; that he has lain awake at nights for many, many weeks, unable to sleep because of the great and excruciating pain, to his great damage in the sum of $20,000, and in a total sum of $20,-500." It is conceded that those quoted are the only averments which can be referred to as supporting the right to recover damages for future pain and suffering.

In T. & P. Ry. Co. v. Curry, 64 Tex. 86, a similar question was involved, and, in disposing of it, Justice Stayton used this language: "The rule regulating pleading in this class of cases is thus stated: 'The general allegation of damages will suffice to let in proof and to warrant recovery of all such damages as naturally and necessarily result from the wrongful act complained of; the law implies such damages (that is, damages of that sort), and proof only is necessary to show the extent and amount. But where damages actually sustained do not necessarily result from the act complained of, and consequently are not implied by law, the plaintiff must state in his declaration the particular damage which he has sustained, for notice thereof to the defendant; otherwise the plaintiff will not be permitted to give evidence of it on the trial.' 3 Sutherland on Damages, 426. * * * This is a just rule of pleading, for it requires the person seeking relief, by his pleadings, to inform the adverse party of the facts upon which he intends to rely for a recovery, thereby avoiding surprise. The rule, however, is satisfied when, from the facts stated, the law infers other fact or facts, for, whatsoever the law infers from a given state of facts, the adverse party is presumed to know, and must take notice of, whether it is specially pleaded or not. The law infers, when such injuries to the person are shown to have existed as are alleged and proved in this case, that physical pain resulted therefrom, for by common observation we know that, in the ordinary operation of natural laws, pain is a necessary result of such injuries, unless the condition of the injured

person be abnormal, which will not be presumed. This is equally true as to mental suffering, for it is contrary to common experience and the laws of man's existence and nature that any sane, healthy, and robust person by physical injuries may be made a cripple for life, in a matter affecting his health, comfort, or capacity, without mental pain resulting from the changed condition." This language is applicable to the facts involved in this case. Shaw's leg had been broken by a violent blow, and was subsequently amputated. It was unnecessary for him to allege that he suffered physical and mental pain as a result of those injuries, for, as stated above, that would be inferred as the natural consequence of the physical conditions described. But the question here is: Did those averments justify the inference that mental and physical pain would be felt in the future; that is, after the date of the trial? We think so. The normal inference would be that pain would be felt to a greater or less extent till the wound healed; and it is a matter of common experience that, in cases where limbs are amputated, peculiar nervous sensations continue indefinitely. It was not alleged that the wounds had healed at the time of the trial, and there was no sufficient basis for a presumption that the pains had entirely ceased. The assignment is overruled.

[7, 8] Appellant requested the following charge: "You are charged that the fact that the plaintiff received an injury does not entitle him to recover, but, before he can recover, the burden is upon him to prove, by a preponderance of the evidence, that the engineer of the loader was guilty of negligence that resulted in the injury; and you are further instructed that an act cannot be negligent unless a person of ordinary care, situated as the engineer was, would have reasonably foreseen that the act might result in injury to some one. Therefore, if you find from the evidence that the plaintiff did give the engineer a signal to stop the loader engine, and that the engineer did stop the said engine, and started it again without a signal, but you further find that a person of ordinary care, situated as the engineer was, would not have reasonably foreseen that the engine being thus started might result in injury to some one, he would not be guilty of negligence, and if you so find you will return a verdict for the defendant." It·is true that in order to create actionable negligence the circumstances must be such that the actor should have anticipated that an injury of some character would probably result from the negligent conduct. T.·& P. Ry. Co. v. Bigham, 90 Tex. 223, 38 S. W. 162. The question of whether or not the consequences should have been anticipated should be submitted to the jury only when the evidence is such that a jury might properly find in favor of the party sought to be held liable for the injury. We are of the opinion that no such state of facts existed in this instance. Considering the situation of the parties, the length and weight of the steel rail being handled, and the force employed to hoist it, there is no room for the assumption on the part of Gill that no injury would probably result to one coming within its reach. According to Gill's own testimony, he knew that the rail was fastened in some way, and his object in continuing the application of steam was to force it loose. He does not intimate that he did not think Shaw was in danger if within reach of the rail. Gill testified as follows: "I always gave them time to get out of danger. That morning Shaw would venture in, and I asked him to please stand out of the way as he might get hurt." This indicates that Gill had in mind at the time an existing apprehension that some of them might get hurt if they came within reach of the rail. It appeared to be a custom for the parties who fastened the cable to the rail to then step back out of the way. The requested charge is also subject to the objection that it repeats to the jury the statement that the burden of proof is on the plaintiff and contains other matter in its preamble which was calculated to mislead the jury to the prejudice of the appellee.

All of the remaining assignments of error have been considered. We deem it unnecessary to discuss them in detail.

The judgment of the district court is affirmed.