## WICHITA FALLS & S. R. CO. v. HOLBROOK.*

### No. 12640.

Court of Civil Appeals of Texas. Fort Worth.

March 5, 1932.

Rehearing Denied April 30, 1932.

Bullington, Humphrey & King, of Wichita Falls, and Fred T. Arnold, of Graham, for appellant.

Raymond E. Buck, of Fort Worth, for appellee.

CONNER, C. J.

This appeal is from a judgment in favor of Henry M. Holbrook, appellee, against the appellant Wichita Falls & Southern Railroad Company for the sum of $18,000 damages for personal injuries received by him on or about November 20, 1929.

The evidence shows that the appellant company operates a line of railway from Wichita Falls in a southerly direction through Olney, Young county, and on to Breckenridge, and thence to Dublin, Tex., where it connects with the Missouri, Kansas & Texas Railway Company. Appellee at the time of the accident was engaged in his work as a brakeman. He was 48 years of age and had been engaged in railroading for about 23 years, about 8 years of which time prior to the accident he had been in the employment of the appellant company. He was familiar with the right of way and all the switches along the line of appellant company, and familiar with the custom and practice employed by appellant company in switching its cars at various points and stations along the line of railroad. At the time of the accident appellee was a brakeman on a local freight running between Wichita Falls and Breckenridge, and on the morning of the accident he left Wichita Falls on his regular run to Breckenridge. This local freight did switching at intermediate points along the line, and it was the duty of appellee, as brakeman, to uncouple cars, manipulate the brakes, throw switches, and do switching service generally at such intermediate points as was required. On the day in question appellee was serving as head brakeman on the train which reached Olney about noon. When the train arrived at Olney it stopped and appellee, with the other members of the crew, went to dinner. After eating dinner, a Mr. Cooper, the rear brakeman, and the conductor went into the depot and received a list of work to be done by the crew at Olney, which list the conductor gave to the rear brakeman. The conductor then returned to the station and the remainder of the crew, under the direction of the rear brakeman, went down to the "wye" to pick up three cars, one or more of which were to be incorporated in the further progress of the train. The wye was located on the east side of the main line, the engine fronted in on the wye and attached thereto three cars and started back on the main line with a view of shifting the three cars on what was termed a passing track. The passing track was also situated on the east side of the main line. The switch points leading from the wye to the main track were some 6, 7, or 8 feet perhaps south of the switch points leading from the main track out upon the passing track. The movement indicated is designated as a "drop of three cars," or "flying switch." The purpose of the movement was to reverse the relative position of the engine and the cars which were dropped on the passing track. There was a switch stand some 5 feet east of the east line of the main track. The switch points were some 15 feet long, the sharp ends of which were attached to a rod leading to the switch stand, this rod was attached to a projecting knuckle on the bottom of a revolving rod extending up through the switch stand some 5 feet where it was surmounted by a round disc into the edges of which were three notches. These notches were used for the reception of a handle, which, when at rest, extended downward. When the switch points were moved so as to permit the passage of trains on the main line, the handle was in the notch immediately opposite and east of the switch points and the main track. The one to the right was located in the southwest part of the disc and the one to the left in a northeasterly direction from the disc. At the time in question, after having attached the engine to the three cars on the wye, both brakemen and the engineer and fireman proceeded

on the engine until near the switch for the passing track, where appellee, upon the direction of the rear brakeman and in the performance of his duty, dropped off at the switch stand. The engine was then unconnected from the three cars and proceeded along the main line north rapidly, and, after it had passed the switch points to the passing track, appellee turned the switch so as to throw the cars onto the passing track. The momentum of the three cars, however, was not such as to clear them from the main track, the forward of the three entering upon the passing track switch points, but stopped before it cleared the main track, about one-half of the car being on the side track and about one-half on the main track. At this point the rear brakeman directed appellee to see if any one or more of the three cars had brakes on. The brakes were found to be on one car which was loosened and appellee returned to the switch stand. The engineer then, by the direction of the rear brakeman, who was the foreman in the direction of the operation, moved forward against the front car in an effort to push the three cars onto the main track, but by reason of the position of the car this failed, and the rear brakeman went to the north side of the right of way and picked up a piece of timber about 4x4″ and 7 feet long; this was placed against the pilot beam of the engine and against the car, and the engineer was directed to move forward; he did so, but with a force to break the pole. Appellee's evidence, however, authorizes the conclusion that the force then applied moved the three cars back onto the main line and the engine proceeded forward until the front trucks came upon the switch points and continued to so proceed until the switch point resting on the inside of the western line of the main track was suddenly and violently pressed away, thus communicating a lateral force along the switch rod leading to the stand. At the time of the effort to move the cars by the pole, Cooper, the rear brakeman, was on the opposite side of the track, as was also the engineer, the fireman being on the east side. Appellee, with the purpose of throwing the switch as soon as the three cars ran off onto the main track, took hold of the handlebar that turns the disc and had pulled it about halfway out of the slot in the disc when the lateral pressure of the engine on the tips of the switch point caused the handle to fly out and around against appellee's lower bowels and inflict the injuries on account of which he sued.

Appellee knew that the poling movement was to be made; he knew the relative position of the wheels of the front truck of the front car and the wheels of the pony truck of the engine. He testified that the switch points were about 15 feet long. He knew what would happen if the wheels of the engine rolled upon these points with the switch thrown against it. He knew that this would put a pressure on the points, and that, if the switch lever was out, it would be thrown violently around.

After defining the terms "negligence," "proximate cause," "new and independent cause," "ordinary care," and "contributory negligence," the court submitted the case to the jury on special issues, in answer to which the jury found that the engineer was guilty of negligence "in the manner and way he moved such engine along the switch points at the time and place in question." And that "such negligence was a proximate cause of the injury to the plaintiff." That the pole used in the switching operations "was insufficient in size and material for the use it was being put to," and that the use of such pole by defendant's crew constituted negligence which was a "proximate cause of plaintiff's injury." The jury also found that the crew operating the train was guilty of negligence "in the manner in which the pole was placed between the engine and box car," and that such negligence was a "proximate cause of plaintiff's injury." Also that the rear brakeman (Ditto) was guilty of negligence that proximately contributed to plaintiff's injury in signaling the engineer "to move the engine forward" at the time and place in question.

No one of appellant's propositions of error is based upon the contention that the foregoing findings of the jury are unsupported by the evidence. We need not, therefore, relate the circumstances which sufficiently support those findings. The vital questions presented are: Did appellee assume the risk of the danger and injuries incident to the work at which he was engaged at the time? If not, was he guilty of negligence in any degree which proximately contributed to his injuries?

Article 6432, Rev. Civ. Statutes, chapter 10, title 112, relating to railroads, reads as follows: "Every person, receiver, or corporation operating a railroad or street railway, the line of which shall be situated in whole or in part in this State, shall be liable for all damages sustained by any servant or employee thereof while engaged in the work of operating the cars, locomotives or trains of such person, receiver, or corporation, by reason of the negligence of any other servant or employee of such person, receiver or corporation, and the fact that such servants or employees were fellow-servants with each other shall not impair or destroy such liability." See, also, article 6439, of the same chapter.

Article 6433, among other things, provides, in substance, so far as necessary to note, that employees who are intrusted with the authority of superintendence, control, or command of the other servants or employees of a railroad corporation, with the authority to direct any other employee in the perform-

431

ance of any duty of such employee, are vice principals of such corporation and are not fellow servants with their coemployees. It will be noted that, in the absence of qualification, the terms in article 6432 impose absolute liability upon the corporation in cases where a person is injured by reason of the negligence of any other servant or employee of the corporation. In other words, the terms of the article, unless qualified, are broad enough to exclude all defenses against liability for an injury to a servant of a railroad company while operating its cars, locomotives, or trains. However, we find that the general terms referred to are qualified by articles 6436 and 6437. Article 6436 reads as follows: "Nothing in the preceding articles of this chapter shall be held to impair or diminish the defense of contributory negligence when the injury of the servant or employee is caused proximately by his own contributory negligence, except as otherwise provided in this chapter."

Article 6437, so far as necessary to note, reads as follows: "The plea of assumed risk shall not be available as a bar to recovery of damages in any suit brought in any court of this State against any corporation, receiver or other person, operating any railroad, interurban railway or street railway in this State for the recovery of damages for the death or personal injury of any employee or servant caused by the wrong or negligence of such person, corporation or receiver; it being contemplated that while the employee does assume the ordinary risk incident to his employment he does not assume the risk resulting from any negligence on the part of his employer, though known to him. * * * "

The court submitted both the issue of contributory negligence on plaintiff's part and the issue of whether he assumed the risk involved. The jury answered that at the time and place in question the plaintiff moved or attempted to move the switch lever (alleged as a ground of contributory negligence), but that such action on his part did not constitute contributory negligence. We think the evidence amply sustains this finding, and we find no prejudicial error in the refusal of the court to submit a number of special issues requested by appellant relating to this subject, such as whether the switchman in approaching the switch and in attempting to lift the switch bar approached from the north side, etc. As we view the evidence, the special issues requested and refused by the court relating to the subject merely evoked evidentiary facts of no probative force, which the jury must necessarily have considered in determining the ultimate fact of whether appellee was guilty of contributory negligence. We accordingly overrule all propositions of error relating to the issue of contributory negligence.

In introducing the subject of assumed risk, the court charged the jury that:

"A railroad employee entering and remaining in the service of the railroad company, assumes the risk ordinarily incident to the employment 'in which he is engaged. A railroad employee does not assume a risk brought about or growing out of the railroad's negligence unless he knows, or in the discharge of his duty must have ascertained the existence of such negligence and appreciated the dangers arising to him therefrom.

"Now bearing in mind the above definition, you will answer:

"Do you find from a preponderance of the evidence that the plaintiff was struck by the switch lever by reason of a risk assumed by him? Answer as you find the facts to be."

The answer was no. We fail to find prejudicial error in the definition given or in the submission of the issue. The definition seems to be in accord with the charge of the court in the case of Fort Worth & Denver Ry. Co. v. Stovall (Tex. Civ. App.) 272 S. W. 594, 595. And we fail to find any evidence that would have supported a finding other than that returned by the jury. It is not disputed in the evidence that the rear brakeman Ditto, who was not called to testify, was charged with the authority and duty of controlling the switching operation undertaken at the time, and his position and authority, as it seems to us, clearly brings him within the statutory definition of a vice principal. And the evidence shows that the engineer's movements were to be and in fact were controlled by the signals of this brakeman. One of the jury's findings is to the effect that, upon placing the pole against the car, the engineer was signaled to go forward, which he did, but the evidence fails to show that Ditto gave a signal to stop upon the breaking of the pole. Ditto was upon the opposite side of the track from appellee, as also was the engineer, and appellee testified without contradiction that he could not see those parties. There is nothing to indicate that he had authority to select the pole used or to countermand its use, or to direct the engineer in the movement of the engine. The evidence also seems to be undisputed that on the breaking of the pole the advance of the engine upon the switching points was almost instantaneous and with evident force, and there is but little, if anything, to suggest that appellee in the interim could possibly have ascertained the negligence of Ditto and the engineer, as found by the jury, and appreciate the danger arising therefrom.

Appellant also complains that the court erred in overruling its motion for a new trial, based on the ground of misconduct on the part of the jury. The issue first submitted in the court's charge was whether the engine had moved upon the switch points

just prior to the time and place of appellee's injury. And the second issue was whether the engineer was guilty of negligence in the manner and way he moved the engine along the switch points; both issues being answered in the affirmative.

The twelfth issue required a finding of the amount of money that would fairly compensate the plaintiff for the injury sustained by him as the proximate cause of negligence of defendant, if any.

Three of the jurors were sworn. The contention of misconduct is based principally upon the testimony of the juror Price. On his examination he testified, in substance, that, after they had answered issue No. 1 in the affirmative, they proceeded to consider issue No. 2, but were unable to agree upon an answer thereto; that they then referred to issue No. 12 and "figured the amount" appellee ought to have; that he thought appellee should recover something like $14,000; that the highest figure was $20,000; that while they were discussing the amount of damages some one mentioned the attorneys' fees; that somebody said that the attorneys would get 20 or 25 per cent.; that, after the jury had arrived at the sum of $18,000 in answer to issue No. 12, they went back to issue No. 2 "and answered them straight on down the line. I told the jurors that we would have to answer issue No. 2 'yes.' I told them the way we had answered No. 12 we would have to answer issue No. 2, yes. After we had answered issue No. 2 we went to issue No. 3. I don't remember just now how issue No. 3 reads, and I don't remember what I said in regard to our answer to that issue. I don't believe I told the jurors anything with reference to how issues Nos. 2, 3, 4, 5, 6, 12 and so on; we did not discuss any of the evidence in the case. The jurors said the way we had answered No. 12 we would have to answer the other issues so and so and this way and that way, like we did answer them. We answered all the rest of the questions after we had answered issues No. 1 and No. 12."

On cross-examination of this witness, and from the testimony of other jurors to be later referred to, it was developed that reference to attorneys' fees was a mere casual reference, and that in assessing damages no weight was given to it either by the witness himself or by any of the other jurors. He further testified: "I believe I am the one who made the remark about how issues 1 and 2 should be answered. I did not hear any one else make such a remark. I did not make any remark that the issues should be answered in a certain way. Issue No. 14 is the one I said we would have to answer 'no' (the issue of appellee's contributory negligence). I did not hear any one else say anything about that issue and that is all I said

about it. After we returned into the court room with our verdict, the court read the answers over to us and asked us if that was our verdict, and I said it was my verdict, and it was my verdict."

On redirect examination he testified: "When we answered 'no' to the special issue dealing with contributory negligence (issue No. 14), I believe I said we would have to answer the issue in accordance to the way we give in our judgment. We had already given him a judgment in our answer to issue No. 12; after I made the remark as to how we should answer issue No. 14, none of the rest of the jury said we can't do that—they did not say anything about it. There was no discussion as to whether we had to answer that issue according to the evidence. I just made that remark and we answered the issue 'no.' After we got into the jury room and elected Mr. Moore foreman he asked us what we thought about the case. Some of them said, and I believe it was Mr. Parsons, 'I can tell you how I feel, I think he is entitled to a judgment.' I do not believe any one else said anything."

George Parsons testified that he was one of the jurors; that Mr. Moore was elected foreman of the jury, and that he was asked to handle the charge for him and requested to read the charge to the jurors, which he did. He testified: "We answered the first issue and I read the second issue. We answered the first issue 'yes.' After I read the second issue there was some discussion as to the guilt of negligence, as to what the meaning of the question, and we did not decide on it then and sent a note to the court for further explanation of the question. In the meantime while we were waiting on the court's instructions about the second issue, Mr. Price asked to see the charge and he suggested that we see if we could do anything with issue No. 12, and we discussed this issue. * * * We didn't express an opinion at first only as to what should be given him. * * * There was quite a bit of discussion as to how we should arrive at the amount; there was quite a bit of discussion about his condition prior to and after the accident, and whether or not the accident itself was the absolute cause of the condition, or whether he had some other organic trouble before the injury and how long, and what his condition would be from now on, and there was some discussion as to evidence, and as to his physical condition before his accident. Those are the only things we discussed as I now remember it. I didn't hear a word said about the attorneys' fees. * * * After we had answered issue No. 12 we had received instructions from the court concerning issue No. 2, and there was still some discussion about whether we should come back in and let him clarify the situation, and we kept discussing it until we finally reached an an-

swer to it. In our answers to the rest of the issues we discussed them more or less as we read them. * * * In answering the question as to the engineer's guilt we finally arrived at the answer in the affirmative and we felt like he was guilty of negligence in moving the engine—we considered from the evidence that the points were thrown, causing the switch to turn around, due to the fact that the engine moved upon the switch points, and that was practically the discussion on this question. * * * I don't remember whether Mr. Price had anything to say about that or not. * * * We answered issue No. 4 'yes' and had quite a bit of discussion about it, and we discussed the evidence in connection with this issue." (Issue No. 4 was the one in answer to which the jury found that the pole used in the switch operation was insufficient in size and material for the use to which it was being put.)

On cross-examination he testified:

"To some extent we discussed the evidence in connection with every one of the issues. I think we did that before and after we discussed the questions of damage. We did not answer all the questions until we had been discussing No. 12 and we were waiting on the court's instructions at that time, and we had not discussed the other questions until we had made some agreement on No. 12. We tentatively agreed on the amount when we first discussed issue No. 12, and the exact amount we arrived at was written into the verdict. We were discussing what we would give him if we found that the company owed him anything. We were trying to find some questions we could discuss while we were waiting on the court's instructions, to see if we could answer some other questions. * * * In arriving at the amount we gave him, we took his average earning around $1,500.00, his yearly earnings, and we gave him a life expectancy, in other words he would be retired in 12 years with half pay, and we gave a life expectancy of 12 years and we multiplied that by $1,500.00, and I believe he had asked for $175.00 a month, it was near what he said he asked for or what he was getting. * * * There was quite a bit of discussion as to whether it was too much or too little, and there was some compromising, some came down, and some came up, and we finally arrived at the amount stated in the verdict. I don't know as we took a vote on the amount at that time, but we did before we left the jury room and returned with our verdict. We voted by raising our hands on one or two occasions.

"When we got back to special issue No. 12 Mr. Moore asked me to read it again and I did so, and I am positive that he said, 'Gentlemen, are we agreed on this amount,' or something to that effect, and either by acclamation or by hand vote. This happened after we had answered the other questions down to No. 12. I did not hear any reference to that matter of attorneys' fees. I read the complete charge of the court as well as the instructions about not discussing attorneys' fees or hospital bills."

Y. H. Howard testified that he was one of the jurors who sat in the trial of this case; that he did not hear any mention of attorneys' fees during the deliberations of the jury. That "some one early mentioned, I don't know who, probably reading it in the charge, I can't call to memory just now who it was, but they said it must not be considered is all that I remember. That is all I heard about the question of attorneys' fees. I did not allow for attorneys' fees in arriving at my verdict. I was conscious of the fact that we were not to allow for attorneys' fees. In arriving at the answers we gave to the questions contained in the court's charge, I considered the evidence and the charge of the court, that is all."

On cross-examination he said:

"I don't think there was any talk in the jury room about attorney's fees. I don't think we discussed whether the attorneys would get 20 or 25 per cent. * * * We answered the first question and read the 12th question while we had sent the note to the court for instruction on the second question, as well as I recollect, and we were all looking over No. 12 while we were waiting for an answer from the court. We did not at that time agree on the amount of damages, the boys just made the figures on it then and it was discussed later. I don't know why we jumped from No. 2 to No. 12; I don't know why this man turned over to No. 12, I can't explain just exactly why he went to that issue, only we were balled up a little on the engineer, we wanted to know whether it was direct or indirect negligence of the engineer, and while we were getting this information from the court we looked over the other issues. I don't know why this man jumped down to issue No. 12 or why he picked out that particular issue. I don't think it was because we had already decided to give him a verdict and wanted to see how much he would get, we were just looking the issue over. I think we read some of the questions but not all of them at that time. I don't think we tried to give him a verdict as soon as he turned to issue No. 12 but we did some figuring on it, but not much at that time, not as much as we did later, because it would have been more at that time, probably the high man and the low man, and so on.

"We read through issue No. 12 and had to do some figuring on it two or three times, but did not answer the issue at that time, but it was not answered before we answered No. 2. We had to vote on it before we left

the jury room. We had not agreed on how much we were going to give him, we didn't agree on that at the start as we were not together on the amount, we couldn't get together. * * * I couldn't answer your question that we had agreed he was entitled to some sum. We merely figured on it when we looked the question over, but probably that would be just giving a fair estimate of it, that was the only way we knew how to get at it, was to make a few figures and look it over. I don't think we had agreed at that time he was entitled to any amount. It hadn't been discussed that he was entitled to some amount, that is the only answer I can give you, we had not come to that feature of it then. We didn't decide on the amount until we had voted on it. To the best of my knowledge we voted on issue No. 12 just before we come out of the jury room; the foreman says, 'all minds agreed on this, why hold up your hand' and everybody held up his hand and nobody said nothing and we walked out. * * * As I said a moment ago we had not arrived at any conclusion as to the amount we would give him, we had merely made some figures; we were delayed a little bit waiting for this information from the court in regard to issue No. 2, and we went back to the other issues and then come back to No. 12 and filled it out later. * * * When we went to answer the rest of the questions we discussed the matter of contributory negligence. I am not positive the only question on this issue was that we had to answer it 'no' or he would not get anything. I wouldn't be sure just exactly what was said about the negligence of Mr. Holbrook. It is a hard matter to recall every little thing that was said and done while we were in the jury room. We answered issue No. 13 'yes.' (That appellee at the time and place in question had moved or attempted to move the switch lever.) And we answered No. 14 'no,' but I do not remember the exact words that were said in discussing these issues, but we decided there was no negligence on Mr. Holbrook's part. I wouldn't say it did not happen that some one said if we answered issue No. 14 'yes' that he would not get anything, and I would not say that it did happen; it is possible something could have been said about it, and I overlooked it; there could have been something said that I didn't hear."

■■ We think it appears from the testimony that the reference in the jury room to attorneys' fees was but a mere careless remark that carries no force. The charge of the court in the way of instructing the jury to disregard attorneys' fees brought the subject to the mind of the jury as certainly and clearly as the remark of Price, and he testified that no consideration on his part was given to the question of attorneys' fees in rendering his verdict, and it is clear that the testimony of no juror gives weight to any such contention. The testimony of Price, to the effect that he stated issue No. 2 must be answered in the affirmative to be consistent with their findings as to the amount of damages, does not, we think, in the light of the entire testimony, constitute conduct of a character requiring a reversal of the judgment in this case. To give his testimony the effect contended for would certainly tend to impeach his own verdict, and we are disposed to treat this statement, if in fact made, as a mere careless remark of the juror, to which no weight was given either by himself or by any other juror, for the other jurors distinctly testified to the effect that, in answering issue No. 2, the evidence was discussed. No one testified that any weight was given to the suggestion that it was necessary to answer No. 2 in order that plaintiff might recover. Indeed, no juror, in so far as disclosed by the testimony, seems to have heard the remark made, if at all. The failure of the other jurors to hear the alleged remark may be said to constitute negative evidence tending to show that the remark was never made, and it seems reasonably clear that the testimony of Parsons and Howard conflicts with that of Price in his statement that they had agreed upon a verdict in answer to issue No. 12 before returning to the determination of issue No. 2. Price's testimony that some one mentioned attorneys' fees and said they would amount to 20 or 25 per cent. was contradicted by the testimony of two jurors, Howard and Parsons. Likewise his testimony that issue No. 12 was answered first, and then the jury began with No. 2, and answered on down, and in such a manner as to allow plaintiff damages, was likewise contradicted by that of other jurors, quoted above. Hence, the implied finding by the trial judge that such misconduct did not occur cannot be disputed. Article 2232, Rev. Civ. Statutes, provides: "New trials may be granted and judgments arrested or set aside on motion for good cause, on such terms as the court shall direct. * * * "

Article 2234 provides: "Where the ground of the motion is misconduct of the jury or of the officer in charge of them, or because of any communication made to the jury or that they received other testimony, the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or the testimony received, or the communication made, be material."

■■ It is to be remembered that the trial court was the judge of the credibility of the witnesses, and the weight to be given to their testimony, and, as expressed in the case of Bradley v. T. & P. Ry. Co. (Tex. Com. App.) 1 S.W.(2d) 861, 865: "It must be borne in mind that the trial court has the same latitude in passing upon the evidence offered on

the hearing of a motion for new trial as to the credibility of the witnesses and of the weight to be given their testimony, as a jury has with reference to witnesses heard upon the original trial. When a witness is impeached upon a material portion of his testimony, a jury has the right to disbelieve his entire testimony. This is peculiarly within their province.. The trial court in hearing testimony on a motion for a new trial has exactly the same privilege. H. & T. C. Ry. Co. v. Gray, 105 Tex. 42, 143 S. W. 606." To the same effect, see St. L., B. & M. Ry. Co. v. Price (Tex. Civ. App.) 244 S. W. 642, 643; Sandifer v. Ft. Worth Natl. Bank (Tex. Civ. App.) 8 S.W.(2d) 512, writ refused; People's Ice Co. v. Glenn (Tex. Civ. App.) 8 S.W.(2d) 735.

In the case of St. L. B. & M. Ry. Co. v. Cole, 14 S.W.(2d) 1024, 1025, it was held in an opinion by Mr. Justice Leddy, of Section B of the Commission of Appeals, that, even where six or eight jurors called to the stand testified that a certain discussion took place and two jurors testified that it did not, the trial court must be presumed to have believed the two jurors in preference to the six, where no express findings of fact were made. In treating the subject, he said:

"The trial court, in overruling the motion for new trial, made no express finding on this conflicting evidence. In deference to this ruling, we must indulge the presumption that the court accepted the version given by the jurors who testified that the particular misconduct complained of did not occur. Duerler Mfg. Co. v. Eichhorn, 44 Tex. Civ. App. 638, 99 S. W. 715 (writ refused); Corralitos Co. v. Mackay, 31 Tex. Civ. App. 316, 72 S. W. 624.

"It has often been held that the trial court, in considering evidence offered on the hearing of a motion for new trial, has the same latitude in passing on the credibility of the witnesses, and of the weight to be given to their testimony, as a jury has on the original trial. H. & T. C. Ry. Co. v. Gray, 105 Tex. 42, 143 S. W. 606; Bradley v. T. & P. Ry. Co. (Tex. Com. App.) 1 S.W.(2d) 861; C., R. I. & G. Ry. Co. v. Swann, 60 Tex. Civ. App. 427, 127 S. W. 1164."

We cannot think that the evidence as a whole shows that the proceedings in the jury room complained of could or did materially influence any one or more of the jurors to the prejudice of appellant, and appellant's assignments, therefore, complaining of the action of the court in overruling its motion for new trial because of alleged misconduct of the jury, are overruled.

■■■■ We think we must also overrule appellant's final assignment that the judgment is excessive. As we understand the rule, an appellate court will not interfere with the amount of damages unless it shall appear that the verdict is so excessive as to indicate passion and prejudice, and is entirely out of proportion to the damages sustained. We will not undertake to quote the testimony relating to appellee's injuries. But the testimony in his behalf undoubtedly indicates a serious injury that resulted in unconsciousness, great pain, long confinement in a hospital, an abrasion on the lower bowels that resulted in faulty elimination, and a continuous and apparently total incapacity to perform the labor for which he had been trained and was capable of performing. The testimony also shows that before the accident he was a strong man, able to perform work, had a life expectancy of probably 23 years, able to earn from $130 to $150 a month. It is true that there was other testimony tending to show that prior to his injury he was affected with indigestion and faulty elimination as a result of adhesions or fixations in the bowels, but Dr. Johnson, who was called to attend and examine him, testified that he found numerous abdominal adhesions and lots of fixations and obstructions along the intestinal tract in the bowels. He gave it as his opinion that the conditions found by him could result from a severe blow in the abdominal region, and we find nothing in the evidence or proceedings below to indicate that the jury in assessing the damages was actuated by any passion or prejudice. So that, in the light of similar cases of alleged excessive verdicts, we do not feel justified in setting aside the verdict under consideration. See Texarkana & Fort Smith Ry. Co. v. Toliver, 37 Tex. Civ. App. 437, 84 S. W. 375, 377; Wells Fargo & Co. v. Benjamin (Tex. Civ. App.) 165 S. W. 127; Texas & N. O. Ry. Co. v. Brouillette, 61 Tex. Civ. App. 619, 130 S. W. 886; Missouri, K. & T. Ry. Co. v. Nesbit, 43 Tex. Civ. App. 630, 97 S. W. 825, 826; St. Louis S. W. Ry. Co. v. Pope, 43 Tex. Civ. App. 616, 97 S. W. 534, 535; Ehrman v. Brooklyn City R. Co., 131 N. Y. 576, 30 N. E. 67; Texas & N. O. Ry. Co. v. Kelly, 34 Tex. Civ. App. 21, 80 S. W. 1073, 1074; Waters-Pierce Oil Co. v. Snell, 47 Tex. Civ. App. 413, 106 S. W. 170, 171; Houston & T. C. Ry. Co. v. Gray (Tex. Civ. App.) 137 S. W. 729; Houston & T. C. Ry. Co. v. Davenport (Tex. Civ. App.) 110 S. W. 150, 156; Galveston, H. & S. A. Ry. Co. v. Abbey, 29 Tex. Civ. App. 211, 68 S. W. 293; San Antonio, U. & G. Ry. Co. v. Dawson (Tex. Civ. App.) 201 S. W. 247; San Antonio, U. & G. Ry. Co. v. Green (Tex. Civ. App.) 182 S. W. 392; St. Louis, I. M. & S. Ry. Co. v. Brogan, 105 Ark. 533, 151 S. W. 699; Beaumont, S. L. & W. Ry. Co. v. Sterling (Tex. Civ. App.) 260 S. W. 320; Texas & N. O. Ry. Co. v. Harrington (Tex. Civ. App.) 241 S. W. 250; Hines v. Mills (Tex. Civ. App.) 218 S. W. 777.

We finally conclude that all assignments of error should be overruled and the judgment affirmed.

## On Appellant's Motion for Rehearing.

Appellant has filed and presented a motion for rehearing, urging some twenty grounds of error, although the argument is confined to two questions, namely: First, whether the evidence was so conclusive as to authorize the trial court to direct a verdict, or find, as a matter of law, that both appellant and appellee were engaged in interstate commerce at the time of appellee's injury; and second, whether prejudicial error was committed by the trial court in the manner and form of submission of the defense of the assumed risk. We deem it advisable to dispose of appellant's contentions formally, and, in doing so, we will first address ourselves to the contentions that were argued.

█ In our original opinion, we did not affirmatively hold that appellant failed to bring itself under the provisions of the Federal Employers' Liability Act. Irrespective of a decision on that point, we held that, in the state of this record, prejudicial error was not committed by the trial court, even if this defense was inadequately or incorrectly submitted. Article 6437, Revised Civil Statutes of Texas of 1925, provides that a railroad employee does not assume the risk arising from the negligence of his employer. If it is alleged and proven that such an employee continued in the service, after actual or constructive knowledge of the risk and danger arising from negligence, it has the effect only of diminishing the damages, and, under the Texas statutes and decisions, practically amounts to contributory negligence.

█ The burden of establishing the facts that would make available the defense of assumed risk under the Federal Employers' Liability Act (45 USCA §§ 51–59) was on appellant. See T. & N. O. Ry. Co. v. Tilley (Tex. Civ. App.) 297 S. W. 1063; also in (Tex. Com. App.) 6 S.W.(2d) 86. The testimony adduced on the point was neither complete nor conclusive. Opinions and conclusions of an interested witness cannot be relied upon to take an issue from the jury in the absence of corroboration, even though the testimony is uncontroverted by any other witness. C., R. I. & G. Ry. Co. v. Johnson (Tex. Civ. App.) 224 S. W. 277; Mills v. Mills (Tex. Com. App.) 228 S. W. 919; Caldwell v. McGarvey (Tex. Civ. App.) 285 S. W. 859. Since the court did not submit the issue of interstate commerce, and appellant did not request it, it cannot be presumed that this independent issue was found against the judgment. Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.(2d) 1084. Although Bassett testified that the appellant railroad had trackage rights in Oklahoma, its own railroad tracks and terminal were wholly within the state of Texas. This situation is not without probative importance.

█ █ The mere fact of employment by an interstate railroad does not bring the employee within the Federal Employers' Liability Act. Shanks v. Delaware, L. & W. Ry. Co., 239 U. S. 556, 36 S. Ct. 188, 60 L. Ed. 436, L. R. A. 1916C, 797. The record shows that the conductor ordinarily checked the waybills and kept a record of the contents and movement of the trains and cars. In the conductor's absence, his duties were performed by the rear brakeman, who, in this case, was a Mr. Ditto. Shortly before appellee's injury, the conductor handed the waybills and car lists of this train to Ditto, who thereafter directed the movement of the cars and the work of the other brakeman. Presumably the testimony of the conductor and the rear brakeman was available to appellant; certainly the records were accessible to it. Neither witnesses nor records were produced, and, having failed to do so, appellant cannot be heard to complain that they have been deprived of a defense available under the Federal act. Osborne v. Gray, 241 U. S. 16, 36 S. Ct. 486, 60 L. Ed. 865. See, also, Fort Worth & Denver Ry. Co. v. Stovall (Tex. Civ. App.) 272 S. W. 594, 595.

Thus far, we have discussed the propriety of submitting the defense of assumed risk upon the theory that the issue of assumed risk was not raised, but we think that this case must be affirmed, even if it is conceded that the defense was available to appellant.

█ The court correctly defined the risks assumed by a railroad employee. T. & N. O. Ry. Co. v. Tilley, supra; Fort Worth & Denver Ry. Co. v. Stovall (Tex. Civ. App.) 272 S. W. 594. Gila Valley Globe & N. Ry. Co. v. Hall, 232 U. S. 94, 34 S. Ct. 229, 58 L. Ed. 521. A railroad employee is not required to exercise ordinary care to discover defects and dangers arising from the employer's negligence. T. & P. Ry. Co. v. Archibald, 170 U. S. 665, 18 S. Ct. 777, 42 L. Ed. 1188. The negligence and the danger arising therefrom must not only be open and obvious, but must be so open and obvious as that the employee must necessarily have known it in the ordinary discharge of his duties. The definition was not subject to the objection urged in the trial court.

█ Special issue No. 17 submitted the defense of assumed risk in approved form. Southwestern Tel. & Tel. Co. v. French (Tex. Civ. App.) 245 S. W. 997. There was no exception taken on the ground that the submission was too general, and the issues requested by appellant were either affirmatively erroneous or incomplete. Under such circumstances, it is not error to refuse them. Freeman v. G. H. & S. A. Ry. Co. (Tex. Com. App.) 285 S. W. 607. The appellant did not attack these findings of the jury as being unsupported by the evidence in the trial court, and, in that condition of the record, this court could not set aside the jury findings, even if we believed, as we do not, that the weight of the evidence was contrary to the verdict. We find

no evidence to warrant the suggestion that in the brief interval between the occurrence of the negligence, found by the jury, and the accident, appellee could have, in the exercise of ordinary care, saved himself from injury. The appellee was not injured by reason of any inherent danger of poling the cars, but by the increased risk, attributable, not to the method, but to negligence in the manner of performing it. Under such circumstances, appellee could not be held guilty of assuming the risk of such negligence. C. & O. Ry. Co. v. Proffitt, 241 U. S. 462, 36 S. Ct. 620, 60 L. Ed. 1102. The evidence fails to show that the manner in which appellee lifted the lever would have been dangerous except for the subsequent negligence of the brakeman and engineer; therefore, appellee was not injured by the choice of a method, but rather by the negligence of appellant's servants.

We conclude that the motion for rehearing should be overruled.

BUCK, J., did not sit on original hearing, and died on April 19, 1932.